[No. D057302. Fourth Dist., Div. One. May 5, 2011.]

CHARLES E. JONES et al., Plaintiffs and Respondents, v.
IVOR J. JACOBSON et al., Defendants and Appellants.

4

COUNSEL

Dillon & Gerardi, Timothy P. Dillon and Sunjina Ahuja for Defendants and Appellants Ivor J. Jacobson, Anglo African Holdings, Ltd., Anglo African Shipping Co. of New York and Santa Fe Investment Advisors Ltd.

Latham & Watkins, Kimberly Arouh, Jeff G. Hammel and Robert Perrin for Defendants and Appellants Societe Generale and SG Structured Products, Inc.

Baker Marquart Crone & Hawxhurst, Baker Marquart, Ryan Geoffrey Baker and Jonathan M. Jenkins for Plaintiffs and Respondents.

OPINION

**BENKE, Acting P. J.**—Societe Generale (SG) and SG Structured Products, Inc. (SGSP) (together, SG appellants), appeal from the trial court's order denying their petition to compel arbitration of all claims asserted against them in the civil action of Charles E. Jones and Judith W. Jones (the Joneses). Also parties in this appeal are Ivor J. Jacobson (Jacobson), Santa Fe Investment Advisors Ltd. (SFIA), Anglo African Shipping Co. of New York

and Anglo African Holdings Ltd. (together, Jacobson appellants), all of whom "joined" in the SG appellants' unsuccessful motion to compel arbitration.[1]

*None* of the SG (or Jacobson)[2] appellants is a signatory to the agreement that includes the arbitration provision. The agreement instead is between the Joneses and SG Americas Securities, LLC (SGAS), an entity the Joneses did *not* name as a defendant in their amended complaint. The SG appellants nonetheless moved to compel arbitration. That motion was joined by the Jacobson appellants. The trial court denied the motion and the joinder.

On appeal, the SG appellants argue the trial court erred in denying their motion to compel arbitration because (i) the Joneses agreed to arbitrate "any controversy" arising out of the subject matter of the agreement, and the Joneses' claims against them arise out of that agreement; (ii) the arbitration provision applies to any "agent" or "employee" of SGAS and the Joneses' amended complaint includes myriad allegations of wrongdoing by two alleged employees of SGAS, neither of whom, however, are seeking to enforce the arbitration provision; and (iii) the Joneses' claims against them are "intimately founded in and intertwined" with the underlying obligations arising under the agreement between SGAS and the Joneses, and thus the Joneses are estopped from repudiating the arbitration provision in that agreement.

The Jacobson appellants alone argue they are entitled to enforce the arbitration provision under a third party beneficiary theory.

---

[1] In addition to the notices of appeal that were filed by the SG appellants and the Jacobson appellants in the case before us, defendants and appellants Lyxor Asset Management, S.A., and SG Hambros Trust Company Ltd., separately appealed to enforce the arbitration provision (*Jones v. Lyxor Asset Management, S.A.* (D058164, app. pending)). All parties stipulated to consolidate the two appeals and the SG appellants requested calendar preference. We rejected the stipulation to consolidate but granted calendar preference in this appeal and, on our own motion, in the separate appeal, D058164.

[2] The Joneses assert the Jacobson appellants' joinder was procedurally defective because, among other things, it improperly included an argument in favor of compelling arbitration that was *not* in the SG appellants' motion to compel, to wit: that the Jacobson appellants were third party beneficiaries under the agreement that included the arbitration provision. The Jacobson appellants respond their joinder was proper and, in any event, their papers separately satisfied the requirements for their *own* motion apart from the motion to compel arbitration of the SG appellants. We deem it unnecessary to decide whether the joinder was proper because the Jacobson appellants expressly adopted *all* factual and legal averments of the SG appellants in this appeal. As a consequence, our resolution of the issues raised by the SG appellants also resolves the issues raised by the Jacobson appellants in their "joinder," with the exception of their third party beneficiary claim, which we resolve on the merits, *post.*

As we explain, we conclude the trial court did not err when it denied the motion to compel arbitration of the SG appellants. Neither SG nor SGSP satisfied *its* burden to establish the requisite identity of interest between either or both of them, on the one hand, and a "party" to the agreement, SGAS, on the other hand.[3] We also conclude the Jacobson appellants did not satisfy their burden to show they were third party beneficiaries under the agreement.

## FACTUAL AND PROCEDURAL OVERVIEW

The Joneses' amended complaint alleges as follows:

In late 2004, the Joneses became acquainted with Jacobson. Jacobson lived in the same general area as the Joneses and actively courted the Joneses' friendship. Jacobson then represented to the Joneses that he had 40 years of experience as an investment adviser in large, complex securities transactions across multiple continents, that he owned various entities through which he channeled investments and that he had accumulated substantial wealth by investing in " 'fund of funds' hedge fund vehicles."

In November 2004, Jacobson solicited the Joneses to invest money with him. The Joneses explained to Jacobson that any money they would be investing was from their retirement savings and that they wanted to avoid unnecessary risk and invest only in securities with low risk and relatively high liquidity.

During a meeting between the Joneses and Jacobson in December 2004, Jacobson presented the Joneses with a "performance history of investments" he had made over the previous several years and represented that the Joneses could obtain stable returns on their investment by purchasing funds of hedge funds. Jacobson also represented he had relationships with many top-tier hedge fund managers that would enable Jacobson to make investments that would not otherwise be available to the Joneses.

---

[3] We use the term "party" and not "signatory" because SGAS did not actually sign the agreement, nor do the parties argue that SGAS was required to sign the agreement for it to be enforceable. (See *E.O.C. Ord, Inc. v. Kovakovich* (1988) 200 Cal.App.3d 1194, 1202 [246 Cal.Rptr. 456] [if an unsigned document is accepted as a contract between the parties, it is enforceable]; *Benard v. Walkup* (1969) 272 Cal.App.2d 595, 602 [77 Cal.Rptr. 544] [the receipt and acceptance by one party of a writing signed by the other binds the acceptor as well as the signer to the terms of the writing].) As discussed *post*, the arbitration provision was included in a preprinted, two-page standardized contract supplied by SGAS.

Based partly on these representations, the Joneses entered into a joint venture with Jacobson to invest in a leveraged investment vehicle, with each venturer investing $2.5 million into a fund that would, in turn, invest in a diversified portfolio of hedge funds. The resulting fund managed by Jacobson was coined the "Santa Fe Diversified Fund" (Santa Fe Fund).

Initially, Jacobson asked the Joneses to wire the $2.5 million into one of his offshore accounts. When the Joneses expressed some concern about that arrangement, Jacobson proposed, and the Joneses agreed, that each of them would fund the joint venture through an account with SG.

Prior to the formation of the joint venture, Jacobson met with several financial institutions, including SG, in search of an institutional partner that would enhance Jacobson's credibility with potential investors. During one such meeting with SG, Jacobson presented the same investment return information, and made many of the same representations, he had given potential investors like the Joneses. Jacobson also met with representatives of appellants Lyxor Asset Management, S.A. (Lyxor), and SG Hambros Trust Company Ltd. (SG Hambros). Both Lyxor and SG Hambros were wholly owned subsidiaries of SG.

The Santa Fe Fund was organized by SG as a subfund of the Lyxor Master Fund Trust (the Lyxor Trust). SG Hambros was the trustee of the Lyxor Trust and, as trustee, it delegated to Lyxor certain investment advisory functions related to the Santa Fe Fund. Lyxor, in turn, delegated certain of those investment advisory functions to Jacobson. Investors such as the Joneses invested in the Santa Fe Fund through the purchase of "warrants" linked to that fund. Each warrant represented a quantum investment in the Santa Fe Fund and a payment obligation of SGSP, with SG guaranteeing the warrant investments.

SGSP issued the warrants pursuant to an offering circular dated April 20, 2005. The warrants were leveraged with millions of dollars borrowed from SG, which in turn created a "secondary market" for the warrants to allow investors to sell back or "redeem" the warrants. Money raised from the sale of the warrants, along with the money borrowed from SG, was invested in the Santa Fe Fund.

SG, SGSP, Lyxor and SG Hambros (together, SG parties) did not perform proper due diligence on Jacobson, despite having ample opportunity to investigate his investment experience and background (or lack thereof) and despite various "red flags" with regard to Jacobson and his myriad representations. It was only after the Joneses and other investors sustained significant losses in the Santa Fe Fund that the SG parties investigated Jacobson and took steps to prevent him from continuing to act as the manager of that fund.

The Joneses initially purchased 100 warrants on or about April 22, 2005, at a cost of $25,000 per warrant, for a total initial investment of $2.5 million. Over the next several years, the Joneses purchased additional warrants, investing a total of about $8 million in 250 warrants.

The SG parties and Jacobson began working together in late 2005 to accomplish various common goals, including bringing new investors into the Santa Fe Fund to increase the size of its portfolio. The SG parties prepared a presentation for Jacobson entitled the "Q1 2006 Business Plan." The presentation was made to Jacobson by Stanislas Debreu and Guillaume Auvray, who were both "senior employees of one or all of the SG [parties]." The Q1 2006 Business Plan recommended as a long-term objective "hav[ing] an investment advisor charge a fee for investment advisory services," which was in contradiction to the terms of the joint venture agreement between Jacobson and one or more of his entities, on the one hand, and the Joneses, on the other hand. Until this litigation, the Joneses were unaware of the Q1 2006 Business Plan and its proposal they pay fees for investment advisory services. This proposal contradicted what Jacobson had promised the Joneses and was in addition to the fees the Joneses already were obligated to pay under the joint venture agreement.

The SG parties and Jacobson also sought to amend the overall investment strategy of the Santa Fe Fund by way of a supplemental prospectus. Their plan was to convert the structure of the Santa Fe Fund into what they called a "master-feeder" fund structure. Under such a structure, the Santa Fe Fund would invest in the "Santa Fe Master Fund," which would then invest in "a wide range of trading opportunities." The supplemental prospectus issued by the SG parties indicated that Lyxor was responsible for managing the amount by which the warrants were leveraged and that SG Hambros and Lyxor were responsible for handling the liquidation of any assets required to satisfy any warrant redemption request.

The SG parties also developed a Web site for the Santa Fe Fund, which provided information to warrantholders and to potential investors, and which listed both Jacobson and Auvray of SG as contacts for additional information.

Jacobson, in cooperation with the SG parties, prepared a 29-page "information memorandum" in June 2006 setting out the details and features of the Santa Fe Fund. The information memorandum specifically mentioned SG, Lyxor and SG Hambros, and stated that Lyxor, as part of the "team," set the Santa Fe Fund apart from other funds: " 'Lyxor has a relationship with about 650 asset managers, 140 of which fund separate accounts for Lyxor, and [Lyxor] possesses, in many cases, a great deal of insight and information

on these managers which will be available to the Investor, together with Lyxor's own expertise in asset allocation, macro opinions and asset manager selection.' "

The information memorandum also stated that Lyxor would perform "due diligence review" for the Santa Fe Fund, that this Fund "features a 'low risk portfolio [that] allows for 2-3x leverage designed to protect capital' " and that "[e]nhanced [r]eturns" are " 'achieved through 2-3x leverage on a highly conservative portfolio.' " The SG parties assisted in the preparation of the information memorandum.

Seeking to further their common goals, Jacobson, with the backing of the SG parties, solicited the Joneses to make additional investments in the Santa Fe Fund. The Joneses purchased 73 additional warrants in late March 2006, at a price of $33,100 per warrant, for a total purchase price of $2,416,300. When they purchased the additional warrants, the Joneses were unaware of the plan of the SG parties and Jacobson to amend the investment strategy of the Santa Fe Fund.

Jacobson represented to the Joneses that converting the Santa Fe Fund from its initial structure to the proposed master-feeder structure would not affect the Joneses. Jacobson also represented the change would allow him to charge others a fee for managing the Santa Fe Fund, that it would bring more investors into the fund and that the fund would become more profitable, as it would give Jacobson the opportunity to invest in a greater variety of hedge funds and obtain better returns. The SG parties sponsored the conversion to the master-feeder structure, as they too would realize more profits by adding more investors to, and permitting larger investments in, the Santa Fe Fund. Relying on Jacobson and the SG parties, the Joneses agreed to a reorganization of the Santa Fe Fund into a master-feeder structure.

In early 2007, Jacobson offered to sell 50 shares, or 5 percent of his investment company, SFIA, to the Joneses for $140 per share. The sale was memorialized by a "Securities Purchase Agreement" dated May 1, 2007 (SPA). Under the SPA, the Joneses also agreed to purchase 50 additional warrants at a purchase price of $43,710 per warrant, for a total purchase price of $2,185,500. The SPA contained a purported "lockup" provision that sought to preclude the Joneses from transferring some warrants through 2010. The Joneses never received any SFIA shares in exchange for their $7,000 payment.

After the SPA, Jacobson became "increasingly distant and inaccessible" to the Joneses, who began to express concern that the Santa Fe Fund was overleveraged. Jacobson on at least three occasions also sought to increase

the fees he was charging to manage the Santa Fe Fund. The last fee increase took place in late 2008, as the Santa Fe Fund was losing a significant amount of its value. Despite Jacobson's promises to the contrary, the Joneses paid fees not only on invested principal, but also on the borrowed leverage. They also paid interest on the borrowed amount and fees on gains realized from the Santa Fe Fund. Because the fees earned by Jacobson were a percentage of assets under management, Jacobson raised his fees for managing the Santa Fe Fund to keep his compensation steady, even as the fund was sustaining heavy losses.

In early 2008, Jacobson sought to enter into an investment advisory agreement with a third party at a cost of $200,000 per year. Jacobson asked the Joneses to split this expense, but the Joneses refused, believing it unnecessary for Jacobson to hire a third party to manage the Santa Fe Fund when Jacobson allegedly was a qualified, experienced investment adviser and the SG parties were overseeing the proper and prudent management of the Santa Fe Fund.

Jacobson promised the Joneses in February and March 2008 that they could redeem their investment in the warrants without any problems. In April 2008, another warrantholder redeemed a portion of his warrant holdings in the Santa Fe Fund. That same warrantholder redeemed the balance of his warrants in October 2008. In both instances, neither the Jacobson appellants nor the SG parties sought to prevent that warrantholder from redeeming his warrants in the Santa Fe Fund.

That was not the case for the Joneses, however. Although Stanislas Debreu of SG remained optimistic about the Santa Fe Fund in May 2008, as evidenced by his e-mail to the Joneses that "[a]ll in all . . . the Santa Fe warrant[s remain] a good investment," the Joneses nonetheless decided to redeem their 250 warrants in the Santa Fe Fund. Initially, when the Joneses told Jacobson they wanted to redeem all their warrants, Jacobson responded he would oppose that request because of the "lockup" provision in the SPA.

The Joneses next turned to the SG parties. On May 26, 2008, the Joneses discussed with Auvray their desire to redeem their warrants. Auvray instructed the Joneses to e-mail that request. The next day, the Joneses sent Debreu a letter notifying the SG parties of their intention to redeem their warrants. The Joneses purposely submitted their notice 35 days prior to the end of the next month, pursuant to the terms explicitly stated on the monthly reports sent to warrantholders of the Santa Fe Fund. The SG parties responded that the Joneses' request would not be a problem, but that it was made too late to be honored that month.

The Joneses repeated their redemption request in a June 23, 2008 letter addressed to Debreu, who served as the liaison between the SG parties and the Joneses. A few days later, counsel of the Joneses sent a letter to the SG parties reiterating the Joneses' intention to redeem all their warrants and noting the Santa Fe Fund then had sufficient liquidity to pay the Joneses. Counsel of the Joneses also reiterated the Joneses' concern regarding the management (or lack thereof) of the Santa Fe Fund.

Because neither Jacobson nor the SG parties wanted the Joneses to redeem their warrants, and despite then rapidly deteriorating market conditions, Jacobson, with the support of the SG parties, invested virtually all of the Santa Fe Fund's available cash and borrowing capacity in hedge funds with lockup periods of up to two years or more or in funds with severe redemption penalties. Jacobson and Debreu actively conspired to commit all assets of the Santa Fe Fund that otherwise could have been used to satisfy in full the Joneses' redemption request.

After several months passed, the SG parties offered to redeem a small percentage of the Joneses' warrants. The Joneses rejected this offer, however, because the value of the warrants had plummeted. In addition, the SG parties' offer involved only a small fraction of the Joneses' warrants and was conditioned on the Joneses executing a release of all claims in favor of the SG parties.

In early October 2008, Debreu e-mailed Jacobson that the Santa Fe Fund was in "total liquidation mode" and was no longer being risk managed by the SG parties. That e-mail also stated that every dollar obtained from the liquidation would first go to pay off the SG parties. In late 2008, SG terminated Jacobson's management of the Santa Fe Fund. In mid-January 2009, SG issued a notice to all warrantholders that SFIA had resigned as adviser to the Santa Fe Fund and that this was a "[f]und [t]ermination [e]vent." In mid-March 2009, the SG parties informed the warrantholders that following the liquidation strategy set by SFIA, Lyxor and SG intended to wind down the master fund and feeder fund.

In early September 2009, SGSP issued a notice stating that it would issue only a partial payment to the warrantholders, while fully repaying the leveraged funds borrowed from the SG parties. As such, in late September 2009, SGSP made a partial payment to the Joneses.

The Joneses initially sued only the Jacobson appellants. After extensive discovery, including taking the depositions of Debreu and Auvray, the Joneses amended their complaint to add the SG parties—SG, SGSP, Lyxor and SG Hambros.

In response, the SG appellants moved to compel arbitration, alleging that all of the Joneses' claims against them arose under the account agreement containing the arbitration provision. The Jacobson appellants "joined" in that motion.

The trial court denied the motion of the SG appellants to compel arbitration and the joinder in that motion by the Jacobson appellants. The trial court found the SG appellants did not "[meet] their burden of proving the existence of an agreement to arbitrate the current dispute between the parties . . . [because] the SG [appellants] are not parties or signatories to the Account Agreement. Thus, there is no written agreement to arbitrate disputes between [the parties]." The trial court further found the doctrine of equitable estoppel did not apply because the SG appellants did not establish that the Joneses' claims against them "are founded in or intertwined with the Account Agreement entered into between [the Joneses] and SGAS."

## DISCUSSION

### I. *Enforcement of an Arbitration Provision by Nonsignatories*

### A. *Standard of Review*

"Whether an arbitration agreement applies to a controversy is a question of law to which the appellate court applies its independent judgment where no conflicting extrinsic evidence in aid of interpretation was introduced in the trial court. [Citation.]" (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670 [53 Cal.Rptr.2d 515]; see also *Brown v. Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4th 938, 953 [85 Cal.Rptr.3d 817].)

However, if there are material facts in dispute, we must accept the trial court's resolution of such disputed facts when supported by substantial evidence. (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 [35 Cal.Rptr.2d 800].) We also must presume the court found every fact and drew every permissible inference necessary to support its judgment or order, and we must defer to the court's determination of credibility of the witnesses and weight of the evidence in resolving such disputed facts. (*Ibid.*)

### B. *The Account Agreement and Arbitration Provision*

The arbitration provision is included in a preprinted, standard form,[4] two-page contract supplied by SGAS titled "[a]ccount [a]greement."[5] The arbitration provision is found in paragraph 9 of the account agreement, which provides as follows:

"* Arbitration is final and binding on the parties.

"* The parties are waiving their right to seek remedies in court, including the right to jury trial.

"* Pre-arbitration discovery is generally more limited than and different from court proceedings.

"* The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of ruling by the arbitrators is strictly limited.

"* The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

"* No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from

---

[4] The Joneses have not argued that the arbitration provision is unconscionable and thus unenforceable as a contract of adhesion. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113 [99 Cal.Rptr.2d 745, 6 P.3d 669] [a contract of adhesion is defined as " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it' "].) Nor have they argued the arbitration agreement should not be enforced because their controversy also affects third parties not bound by the arbitration provision. (See Code Civ. Proc., § 1281.2, subd. (c); *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 393 [25 Cal.Rptr.3d 540, 107 P.3d 217] [Code Civ. Proc., § 1281.2, subd. (c) "is an evenhanded law that allows the trial court to stay arbitration proceedings while the concurrent lawsuit proceeds *or* stay the lawsuit while arbitration proceeds to avoid conflicting rulings on common issues of fact and law amongst interrelated parties."].)

[5] There actually were two separate account agreements signed by the Joneses. One such agreement is dated May 16, 2005, and the other is dated May 29, 2005. The agreements contain *identical* terms. However, the May 16 agreement has an account number and a "new accounts" stamp dated May 23, 2005, neither of which appears in the May 29 agreement.

the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

"Any controversy arising out of or relating to any of my accounts, to transactions with you for me, or to this or any other agreement or the construction, performance or breach thereof, shall be settled by arbitration before an arbitration panel appointed by the NASD or the New York Stock Exchange, Inc. or the American Stock Exchange, Inc. (and only before such a panel) as I may elect. If I do not make such election by registered mail addressed to you at your main office (Attn: Legal Dept.) within five (5) days after demand by you that I make such an election, then you may make such election. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The provisions of this paragraph shall also apply to any such controversy involving any agent or employees of yours."

As also relevant here, paragraph 11 states that the account agreement is governed by and construed in accordance with the law of New York.[6] Paragraph 12 defines the parties to the account agreement as follows: "The words 'I,' 'me,' 'my,' 'us,' and 'the undersigned' shall refer to the person or persons whose signature(s) appear below, and 'you,' 'your' and 'yourselves' shall refer to SG Americas Securities, LLC. The word 'property' means securities of all kinds, monies, options, commodities, and contracts for the future delivery of, or otherwise resulting to, commodities or securities and all property usually and customarily dealt in by brokerage firms."

Also noteworthy is paragraph 7 of the account agreement. It provides: "If my account has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you, (i) orders for the purchase or sale of securities or other property for my account, on margin or otherwise, and (ii) any other instructions concerning my account. I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents. The terms and conditions of

---

[6] The Joneses argue California law governs because the account agreement is inapplicable in this dispute. The SG appellants argue that California law governs the standard of review, that New York "substantive law" governs the dispute regarding the enforcement of the arbitration provision by nonsignatories, but that " 'the relevant substantive law of California and the relevant federal law are both in accord with New York law.' " We note also that the SG appellants rely heavily on California law, as do the Jacobson appellants. Because all parties in this appeal agree that California and New York "substantive law" are functionally equivalent regarding when nonsignatories to arbitration agreements may enforce arbitration, we look to California law to resolve this dispute.

this Agreement, including the arbitration provision, shall be applicable to all matters between such other broker-dealer and me."

## C. *Burden of Proof*

■ A party to an arbitration agreement may petition the court to compel other parties to arbitrate a dispute that is covered by their agreement. (Code Civ. Proc.,[7] § 1281.2; *Segal v. Silberstein* (2007) 156 Cal.App.4th 627, 633 [67 Cal.Rptr.3d 426].) The petitioner bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. (*Segal v. Silberstein, supra,* at p. 633.)

Here, the SG appellants argue they satisfied their burden of proving the existence of a valid and enforceable arbitration provision in the account agreement(s) signed by the Joneses. (See *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413 [58 Cal.Rptr.2d 875, 926 P.2d 1061] [to satisfy this burden, the motion to compel must be "accompanied by prima facie evidence of a written agreement to arbitrate the controversy" in question].) The SG appellants further argue that the burden then shifted to the Joneses to show the arbitration provision cannot be interpreted to require arbitration of this "controversy" and that the Joneses failed to meet their burden. (See *Titolo v. Cano* (2007) 157 Cal.App.4th 310, 316–317 [68 Cal.Rptr.3d 616].)

■ We disagree with the SG appellants' interpretation of the law as it pertains to the parties' respective burdens of proof when a *nonsignatory* seeks to enforce an arbitration agreement/provision against a signatory. We conclude that in such instances, the nonsignatory bears the burden to establish he or she is a *party* to the arbitration agreement/provision covering the dispute. (See § 1281.2 ["[o]n petition *of a party* to an arbitration agreement" (italics added)].)

The cases relied on by the SG appellants regarding the burdens of proof in a motion to compel arbitration by a nonsignatory are not inconsistent with our conclusion. For example, in *Titolo v. Cano, supra,* 157 Cal.App.4th at pages 316–317, there was no dispute that the plaintiff patient was a *party* to the arbitration agreement sought to be enforced by the defendant physician, also a *party* to the agreement. Indeed, the court in *Titolo v. Cano* specifically noted that the plaintiff did not "challenge the validity of the physician-patient arbitration agreement." (*Id.* at p. 317.)

---

[7] Unless otherwise noted, all statutory references are to the Code of Civil Procedure. Section 1281.2 states in relevant part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . ."

Here, *the* issue before us is whether the SG appellants satisfied their burden to establish either or both of them are a party to, and thus are entitled to enforce, the arbitration provision in the account agreement. *Titolo v. Cano* is thus factually inapposite to our dispute; under the facts presented there, the burden properly switched to the plaintiff to show that the defendant's communications, and provision of medical records, to the plaintiff's disability insurer were not the rendering of " 'medical services' " under their arbitration agreement. (*Titolo v. Cano, supra*, 157 Cal.App.4th at p. 317.)[8]

Not surprisingly, the SG appellants have been unable to cite any authority placing the burden on a signatory to show the nonsignatory is not a party to the arbitration agreement. Moreover, such a rule would make little sense in the case before us because the SG appellants have superior access to information, and vastly greater knowledge, than the Joneses regarding whether the necessary "identity of interest" (discussed *post*) exists between the SG appellants and SGAS, such that the SG appellants are entitled to enforce the arbitration provision.

Thus, our inquiry in the instant case is whether the SG appellants satisfied *their* burden to show they together or individually are a party to the account agreement containing the arbitration provision. This inquiry requires us to apply the rules of contract interpretation to construe the arbitration provision in the account agreement.

### D. *Enforcement of Arbitration Provision by the SG Appellants*

#### 1. *Governing Law*

■ Clearly, none of the SG appellants is a "signatory" to the account agreement containing the arbitration provision. Nor is either of the SG appellants included within the definition of "you," "your" and "yourselves"

---

[8] The SG appellants also rely on *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311 [59 Cal.Rptr.3d 340] and *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686–687 [99 Cal.Rptr.2d 809], among other cases, for the proposition that the burden is on the party opposing arbitration (e.g., the Joneses) to show a nonsignatory is not a party to an agreement to arbitrate. Again, neither case supports this proposition. In *EFund Capital Partners v. Pless* the only issue addressed by the court was whether an arbitration agreement was broad enough to cover the plaintiff's tort claims. (*EFund Capital Partners v. Pless, supra*, 150 Cal.App.4th at p. 1319.) Similarly, in *Coast Plaza Doctors Hospital v. Blue Cross of California* the issue did not involve enforcement of an arbitration provision by or against a nonsignatory, but rather whether a party that terminates an agreement containing an arbitration provision before filing an action can still be forced to arbitrate, whether the arbitration provision was broad enough to cover tort claims brought by the party opposing arbitration and whether the arbitration provision was unconscionable. (*Coast Plaza Doctors Hospital v. Blue Cross of California, supra*, 83 Cal.App.4th at pp. 680–681.)

provided in paragraph 12 of that agreement, which words, as noted *ante*, were strictly limited by SGAS to apply *only* to "SG Americas Securities, LLC" and *not* any other SG-related entity (e.g., SG, SGSP, Lyxor and/or SG Hambros). Given that SGAS supplied (ostensibly without negotiation) the two-page "form" agreement signed by the Joneses, it would have been a simple matter for SGAS *at the time of contracting* to have broadened the arbitration agreement to include within its scope other parties, including one or more of the SG parties. (See Civ. Code, § 1636 [the basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting].)

█ As is now obvious, with *limited* exceptions only parties to an arbitration agreement can enforce it or be required to arbitrate. (*Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.* (2005) 129 Cal.App.4th 759, 763 [28 Cal.Rptr.3d 752].) Although public policy "favors arbitration as an expedient and economical method of resolving disputes, thus relieving crowded civil courts" (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 244 [54 Cal.Rptr.2d 628]), "arbitration assumes that the parties have elected to use it as an alternative to the judicial process. [Citation.]" (*Ibid.*)

"Arbitration is consensual in nature. The fundamental assumption of arbitration is that it may be invoked as an alternative to the settlement of disputes by means other than the judicial process solely because all parties have chosen to arbitrate them. [Citations.] Even the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement. 'The right to arbitration depends on a contract.' " (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc., supra*, 47 Cal.App.4th at pp. 244–245; see also *Engineers & Architects Assn. v. Community Development Dept., supra*, 30 Cal.App.4th at p. 653 ["The right to arbitration depends upon contract; a petition to compel arbitration is simply a suit in equity seeking specific performance of that contract. [Citations.]"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 787 [79 Cal.Rptr.2d 273] ["Under both federal and California state law, arbitration is a matter of contract between the parties."].)

█ " 'The fundamental canon of interpreting written instruments is the ascertainment of the intent of the parties. [Citations.] As a rule, the language of an instrument must govern its interpretation if the language is clear and explicit.' [Citation.]" (*Brookwood v. Bank of America, supra*, 45 Cal.App.4th at pp. 1670–1671; see *Segal v. Silberstein, supra*, 156 Cal.App.4th at p. 633 ["When interpreting contracts, the language used controls if it is clear and explicit."].)

██ "We must view the language of a contract as a whole, avoiding a piecemeal, strict construction approach. If possible, we should give effect to every provision and avoid rendering any part of an agreement surplusage. Where an agreement is capable of being interpreted in two ways, we should construe it in order to make the agreement ' "lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the instrument extraordinary, harsh, unjust, inequitable or which would result in absurdity. [Citations.]" [Citation.]' " (*Segal v. Silberstein, supra,* 156 Cal.App.4th at p. 633.)

██ "Exceptions in which an arbitration agreement may be enforced by or against nonsignatories include where a nonsignatory is a third party beneficiary of the agreement [citation] and when a nonsignatory and one of the parties to the agreement have a preexisting agency relationship that makes it equitable to impose the duty to arbitrate on either of them. [Citations.]" (*Nguyen v. Tran* (2007) 157 Cal.App.4th 1032, 1036–1037 [68 Cal.Rptr.3d 906].)

### 2. *Analysis*

The SG appellants contend they are entitled to enforce the arbitration provision in paragraph 9 of the account agreement because it is broadly worded and requires arbitration of "[a]ny controversy arising out of or relating to any of my [(the Joneses')] accounts, to transactions with you [(SGAS)] for me [(the Joneses)], or to this or any other agreement or the construction, performance or breach thereof . . . ." While it may be true that the arbitration provision at issue here is broadly worded, that does not answer the *threshold* question of whether the SG appellants satisfied their burden to show one or more of them are a party to the account agreement containing the arbitration provision.

Moving to the heart of this appeal, the SG appellants argue they qualify as parties to the account agreement because the Joneses' amended complaint establishes that Debreu and Auvray were "central to the misrepresentations allegedly made to the Joneses from 2005 through 2008 regarding the Joneses' investments in the [w]arrants, the handling of the [w]arrants, and the Joneses' ability to withdraw their investments." According to the SG appellants, because the Joneses have conceded that Debreu and Auvray at all relevant times were employees of SGAS, paragraph 9 requires the Joneses to arbitrate their dispute because that provision "shall also apply to any such controversy involving any agent or employee of yours [(SGAS)]."[9]

---

[9] Notably, this language in paragraph 9 generally tracks the common law exceptions to the rule that a nonsignatory to an agreement cannot be compelled to arbitrate and cannot invoke an agreement to arbitrate. These exceptions generally are based on the existence of a relationship

Initially, we reject the argument that the Joneses have conceded that Debreu and Auvray were employees of SGAS.[10] The alleged concession is derived from a statement by the Joneses' counsel in a letter regarding the scheduling of the depositions of Debreu and Auvray, and hardly qualifies as a binding concession that either individual was in fact employed by SGAS. Tellingly, the SG appellants have not proffered any evidence that Debreu and Auvray were ever employed by SGAS, despite having the opportunity to do so in connection with their motion to compel and despite having superior access than the Joneses to such information.[11]

■ Moreover, even assuming arguendo that Debreu and Auvray were SGAS employees, we conclude the "agent or employee" language in paragraph 9 applies only when enforcement of the arbitration provision is by or against a nonsignatory agent or employee of SGAS. (See *Nguyen v. Tran, supra*, 157 Cal.App.4th at pp. 1036–1037 ["Exceptions in which an arbitration agreement may be enforced by or against nonsignatories include . . . when a nonsignatory and one of the parties to the agreement have a preexisting agency relationship that makes it equitable to impose the duty to arbitrate on *either of them*." (italics added)].)

Here, the SG appellants do not argue either of them is an agent or employee of SGAS.[12] Therefore, we independently conclude this language from paragraph 9 of the account agreement is inapplicable in the instant case.

---

between the nonsignatory and the signatory, such as principal and agent or employer and employee, where a sufficient "identity of interest" exists between them. (See *Nguyen v. Tran, supra*, 157 Cal.App.4th at p. 1037; see also *Valley Casework, Inc. v. Comfort Construction, Inc.* (1999) 76 Cal.App.4th 1013, 1021 [90 Cal.Rptr.2d 779] [nonparties may enforce arbitration agreements when there is "sufficient identity of parties"].)

[10] The account agreement does not define the terms "agent" or "employee," nor do we believe it is necessary to define those terms in light of our decision in this opinion.

[11] We also note the letter by the Joneses' counsel was sent two days after the Joneses filed their amended complaint adding the SG parties as defendants in the action. The amended complaint repeatedly refers to Debreu and Auvray as individuals affiliated with, and representatives of, "the SG defendants[/parties]," none of whom include SGAS. For this separate reason, we put little stock in the argument that the Joneses, through their counsel, have *unambiguously* conceded what the SG parties contend is a key factual issue clearly known by them. (See also *Irwin v. Pacific Southwest Airlines* (1982) 133 Cal.App.3d 709, 714 [184 Cal.Rptr. 228] ["[A]n admission is not binding if it is made improvidently or unguardedly, or if it is in any way ambiguous . . . ."].)

[12] The SG appellants waited until oral argument in this court to argue that they, as opposed to Debreu and Auvray, were agents of SGAS, an argument they repeated in their petition for rehearing. However, issues and arguments not addressed in the briefs on appeal are deemed forfeited. (See *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1463 [70 Cal.Rptr.3d 59]; *Boehm & Associates v. Workers' Comp. Appeals Bd.* (2003) 108 Cal.App.4th 137, 148 [133 Cal.Rptr.2d 396].) Moreover, our review of the record shows the SG appellants also did not argue in the trial court in connection with their motion *and* amended motion to compel arbitration that they were the agents of SGAS. Instead, they relied

## II. *Equitable Estoppel*

The SG appellants next argue that even if neither of them is entitled to enforce the arbitration provision as a party to the account agreement, the Joneses are still required to arbitrate this "controversy" based on the judicially created equitable estoppel doctrine.

### A. *Governing Law*

■ Under that doctrine, "a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations." (*Boucher v. Alliance Title Co., Inc.* (2005) 127 Cal.App.4th 262, 271 [25 Cal.Rptr.3d 440]; see also *JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1237.) "This requirement comports with, and indeed derives from, the very purposes of the doctrine: to prevent a party from using the terms or obligations of an agreement as the basis for his claims against a nonsignatory, while at the same time refusing to arbitrate with the nonsignatory under another clause of that same agreement." (*Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 221 [92 Cal.Rptr.3d 534].)

The doctrine focuses on the "nature of the claims asserted by the plaintiff against the nonsignatory defendant." (*Boucher v. Alliance Title Co., Inc., supra,* 127 Cal.App.4th at p. 272.) "Claims that rely upon, make reference to, or are intertwined with claims under the subject contract are arbitrable." (*Rowe v. Exline* (2007) 153 Cal.App.4th 1276, 1287 [63 Cal.Rptr.3d 787]; see also *Goldman v. KPMG, LLP, supra,* 173 Cal.App.4th at pp. 229–230 ["Because equitable estoppel applies only if plaintiffs' claims against the nonsignatory are dependent upon, or inextricably bound up with, the obligations imposed by the contract plaintiff has signed with the signatory defendant, we examine the facts alleged in the complaints."]; *Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1713 [1 Cal.Rptr.3d 328] ["Courts applying [the doctrine] against a signatory have 'looked to the relationships of persons, wrongs and issues, in particular whether the claims that the nonsignatory sought to arbitrate were " ' "intimately founded in and intertwined with the underlying contract obligations." ' " ' "].)

---

exclusively on the doctrine of equitable estoppel to assert in both motions that as nonsignatories they were entitled to enforce the arbitration provision. For this separate and independent reason, we conclude the agency issue is forfeited on appeal. (See *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 826 [79 Cal.Rptr.3d 588]; *Children's Hospital & Medical Center v. Bonta´* (2002) 97 Cal.App.4th 740, 776–777 [118 Cal.Rptr.2d 629].)

### B.  *Analysis*

Here, based on our independent review of the Joneses' amended complaint, we conclude their claims against the SG appellants are not dependent on or inextricably intertwined with the account agreement. None of the allegations in the amended complaint is based on the account agreement or any of its provisions. In fact, the amended complaint does not even reference the account agreement.[13] Of the 21 causes of action asserted by the Joneses, only two are based on contract and both of those causes of action are against the Jacobson appellants for breach of the joint venture agreement, which has nothing to do with the account agreement.[14]

Nonetheless, the SG appellants argue that a sufficient nexus exists between the account agreement and the allegations of wrongdoing made by the Joneses in their amended complaint because "but for" the account agreement, the Joneses would not have been able to purchase any of the warrants that are at issue in this case. We disagree.

We note from the record that the Joneses purchased 100 warrants for $2.5 million *before* they signed the account agreement(s). Thus, the Joneses' purchase of at least some of the warrants was not dependent on their signing the account agreement.

In addition, the Joneses allege myriad acts of wrongdoing by both the SG parties and the Jacobson appellants that predate the account agreement, as set forth in the factual summary *ante*.

Finally, while the focus of the Joneses' amended complaint is the substantial losses they sustained from their purchase of the 250 warrants, they allege that a substantial portion, if not all, of those losses occurred in mid-2008— close to three years *after* they signed the account agreement(s)—when they

---

[13] Although a factor, we note the lack of any mention of the account agreement in the Joneses' amended complaint is not determinative. Instead, we look to the nature of the claims and the relationships of persons, wrongs and issues in determining whether a plaintiff is estopped from asserting the invalidity of an arbitration provision because the plaintiff's claims are dependent on, or inextricably bound up with, the obligations imposed by the contract the plaintiff executed with the signatory defendant. (See *Metalclad Corp. v. Ventana Environmental Organizational Partnership, supra*, 109 Cal.App.4th at p. 1713; see also *Boucher v. Alliance Title Co., Inc., supra*, 127 Cal.App.4th at p. 272.)

[14] To the extent the SG appellants rely on the language in paragraph 9 of the account agreement that requires the Joneses to arbitrate "[a]ny controversy arising out of or relating to . . . this or *any other agreement*" (italics added), we conclude the "any other agreement" language refers to an agreement *only* between the Joneses and *SGAS* relating to any of the Joneses' accounts, or transactions, with SGAS, and not to any other agreement generally. (See Civ. Code, § 1636.)

allege the SG appellants/parties (and Jacobson appellants) inappropriately blocked their myriad requests to redeem their warrants. The Joneses further allege that at the time they made those requests to redeem, the Santa Fe Fund had sufficient assets and liquidity to cash out their investment.

Thus, we conclude the Joneses' allegations, claims and damages in their amended complaint against the SG appellants (and Jacobson appellants) are not "founded in and inextricably bound up with" the obligations imposed under the account agreement. (See *Goldman v. KPMG, LLP, supra*, 173 Cal.App.4th at p. 219.) We therefore reject the argument of the SG appellants that the equitable estoppel doctrine provides an independent basis to enforce the arbitration provision in the account agreement.

### III. *Third Party Beneficiaries of the Account Agreement*

As we noted *ante*, although the Jacobson appellants in this appeal have fully adopted the factual and legal averments of the SG appellants, the Jacobson appellants also included an additional argument not raised by the SG appellants, to wit: as "broker-dealers" within the meaning of paragraph 7 of the account agreement, they are entitled in their own right to enforce the arbitration provision against the Joneses as third party beneficiaries to that agreement. We disagree.

For a nonsignatory to invoke an arbitration provision in an agreement based on a third party beneficiary theory, the nonsignatory beneficiary first must establish the agreement was applicable to the controversy. (See, e.g., *Keller Construction Co. v. Kashani* (1990) 220 Cal.App.3d 222, 229 [269 Cal.Rptr. 259] [a sole general partner of a limited partnership is subject to arbitration agreement between the partnership and a third party because the general partner is an agent and beneficiary of the partnership and because that agreement is applicable to the lawsuit brought by plaintiff].)

Not unexpectedly, the Jacobson appellants have not cited any authority holding a third party beneficiary can invoke an arbitration clause in an agreement not applicable to the lawsuit. As we noted *ante*, there is not a sufficient nexus between the account agreement containing the arbitration provision and the allegations, claims and damages sought by the Joneses in their amended complaint. We thus reject the argument of the Jacobson appellants that they were entitled to enforce the arbitration provision in their own right or as third party beneficiaries.[15]

---

[15] Based on our decision, we deem it unnecessary to decide whether the language in paragraph 7 of the account agreement applicable to a "broker-dealer" (which term is not defined in the agreement) applies to the Jacobson appellants in light of the Joneses' argument that none of the Jacobson appellants was licensed in California to act as a "broker-dealer" of

## DISPOSITION

The order denying the SG appellants' motion to compel arbitration, and the Jacobson appellants' "joinder" in that motion, is affirmed. The Joneses to recover their costs on appeal.

Nares, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied June, 1, 2011, and the opinion was modified to read as printed above.

---

securities. (See *Stockton v. Ortiz* (1975) 47 Cal.App.3d 183, 196 [120 Cal.Rptr. 456] ["a controlling shareholder in a foreign corporation . . . seeking redress in California courts . . . cannot circumvent and frustrate the California body of procedural and substantive law pertaining to derivative actions by asserting that a contract which benefits a foreign corporation is one for his benefit and recover under a third-party beneficiary theory, where if he, as an individual, had entered into the contract in the foreign corporate jurisdiction, it would be illegal and void and thus unenforceable"].) We also deem it unnecessary to decide whether the Jacobson appellants waived their right to enforce the arbitration provision because they actively litigated the case for about 18 months before "joining" the motion of the SG appellants to compel arbitration. (See § 1281.2, subd. (a) [A trial court may deny an arbitration demand when "[t]he right to compel arbitration has been waived by the petitioner . . . ."]; see also *Burton v. Cruise* (2010) 190 Cal.App.4th 939, 944 [118 Cal.Rptr.3d 613] ["[A] party may be said to have 'waived' its right to arbitrate by an untimely demand, even without intending to give up the remedy."].)