Filed 5/26/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| GINA WATSON, Plaintiff and Respondent, v. PROFESSIONAL BUSINESS MANAGEMENT CORPORATION, Defendant and Appellant. | B343093 (Los Angeles County Super. Ct. No. 22VECV00123) |

APPEAL from an order of the Superior Court of Los Angeles County, Shirley K. Watkins, Judge. Affirmed.

Thaler Law and Jesse J. Thaler for Defendant and Appellant.

Law Offices of Douglas Joseph Rosner and Douglas J. Rosner for Plaintiff and Respondent.

_____

# INTRODUCTION

The sole issue before us is whether a nonsignatory defendant's motion to compel arbitration must be granted where the unverified complaint alleges only that the nonsignatory defendant is a "successor, agent and/or alter ego" of the signatory party to the agreement.

A.    *The Second Amended Complaint*

On February 26, 2024, plaintiff Gina Watson filed a second amended complaint (SAC) against The REO Group, Inc, Serve All Help All, Inc, doing business as Nonprofit Alliance of Consumer Advocates (NACA Law or NACA), appellant Professional Business Management Corporation (PBMC), and several other individual and corporate defendants.  The SAC includes five causes of action for breach of fiduciary duty, fraud, conversion, unfair business practices under Business & Professions Code section 17200, and injunctive relief against all defendants.

The SAC alleges that in 2019, Watson purchased her home at 7112 Shirley Avenue in Reseda, California.  In 2020, during the Covid pandemic, she was unable to make her monthly mortgage payments and faced possible foreclosure.  After her lender filed a Notice of Default, Watson was repeatedly contacted by NACA Law, which claimed to be a nonprofit law clinic that would, at no charge, forestall the foreclosure and help Watson refinance into another loan.  Watson agreed to use NACA Law's free services to save her home.  Watson alleges NACA Law was actually a front for a highly sophisticated criminal joint enterprise and conspiracy who took advantage of her and offered her two unconscionable and illegal predatory loans designed to steal her home equity.

With the help of other corporate and individual defendants NACA Law obtained two 1-year bridge loans to forestall the foreclosure on Watson's property. The loans were secured by deeds of trust on her property. Both loans required balloon payments at the conclusion of the one-year terms. Watson defaulted because of the high monthly payments and fees, and the new lenders initiated foreclosure proceedings, levying illegal processing and late fees. Under the threat of foreclosure, Watson was forced to sell her home, at which time defendants claimed illegal and inflated fees, charges and payoff demands.

The SAC identifies the role of each corporate defendant. NACA Law is identified as a shell organization used as an alter ego by the other for-profit defendants to obscure and legitimize an illegal predatory lending and mortgage fraud operation. Defendant PBMC, appellant herein, is a South Dakota corporation doing business in California as a for-profit corporation which allegedly paid the salaries of all NACA Law employees. Specifically, the SAC alleges "Plaintiff is informed and believes that NACA Law's employees are paid by for-profit Professional Business Management Corporation, and they receive commissions off every for-profit service they 'refer' to [other defendants]."

The SAC states that several newly added defendants to the lawsuit, including PBMC, are former Doe defendants unnamed in the initial complaint: "This Plaintiff is now requesting the court to amend this Second Amended Complaint to add the DOE defendants. Each defendant designated herein as 'DOE' was responsible, negligent or in some other manner actionable for the events referred to herein which proximately caused injury to Plaintiff as hereinafter alleged and said defendants are indebted

to Plaintiff as hereinafter set forth. At all times herein mentioned, DOES 1 through 10, inclusive, were the alter ego, agent, managing agent, principal, owner, partner, joint venture, representative, manager and/or co-conspirator of each of the other defendants, and were at all times mentioned herein acting with the course and scope of said agency and employment, and that all acts or omissions alleged herein were duly committed with the ratification, knowledge, permission, encouragement, authorization and consent of each defendant designated herein." The SAC designates PMBC as "DOE 8."

The SAC continues: "At all times hereinafter mentioned, Plaintiff will show, according to proof, that defendants were, and remain, the alter egos, successors, and/or successors in interest, of the remaining defendants." The SAC alleges PBMC and other corporate defendants "are in fact one joint enterprise operating a mortgage fraud scam, and NACA Law is their nonprofit alter ego." "This is their scheme: they entice distressed homeowners with the carrot of a free loan modification or other free services by NACA Law, a purported government approved nonprofit law clinic. [¶] . . . After the distressed homeowner takes their bait, they originate predatory bridge loans to the client and direct loan funds to PBMC, [and other corporate defendants] reaping huge profits, and trapping their unsuspecting victims in a cycle of short-term balloon loans." Watson sought an order enjoining defendants from engaging in such practices and further violations of law; general, special, and punitive damages; restitution; pre- and post-judgment interest; attorney fees; costs of suit; rescission of the loans; and injunctive relief.

4

B.    *The Arbitration Agreement*

When Watson agreed to use NACA Law's free services, she signed a "Services Agreement."  The agreement recited (with punctuation and capitalization unchanged) that Watson "desires to engage Nonprofit Clinic for assistance and guidance, in reviewing financial analysis of Client, the required Clients conditions, Clients current mortgage loan or loans history and Clients potential qualification to obtain a permanent resolution of their mortgage loan issues based upon data made public and current trends and procedures of lenders, based on the experience of Nonprofit Clinic and qualified affiliates. [¶] WHEREAS Nonprofit Clinic is providing Client these free services with the understanding that should client require additional services, Client will give Nonprofit Clinic Affiliates first priority in selection of legal and other professional services."  NACA Law describes its services as:

- "Review of household financial balances"
- "Evaluation and explanation of current loan type"
- "Evaluation of current home's worth"
- "Evaluation of potential cost of existing liability"
- "Evaluation and recommendation to homeowner for long-term sustainability"
- "Evaluation of potential net gain or loss of asset sale vs. cost of restructure note"
- "Evaluation and review of Short Pay/Refi process and possibility"
- "Evaluation and review of standard Short Sale process and its effects versus a Legal litigation"
- "Evaluate and review negative ramifications of walking away from home"

5

- "Reviewing all related documentation for property structure of legal loan modification proposal to lender"
- "Advising of a sensible submission request to lender for long-term affordability"
- "Advising Client of possible Private Investment or Publicly traded Investment Company's ability to Purchase of the Mortgage Note from Clients existing Note Holder with a pre-agreement of re-structuring the said Note down to current Market Value with a fixed rate of interest that will have no Prepayment penalty."

The arbitration provision of the Services Agreement states: "In the event there is any controversy arising between NonProfit Clinic and Client, that matter shall be settled via arbitration in accordance with the American Arbitration Assn."

C.    *Motion to Compel Arbitration*

NACA Law filed a motion to compel arbitration based on the Services Agreement Watson had signed. On June 20, 2024, the trial court granted NACA Law's motion. The trial court explained that the arbitration provision is included in the Service Agreement for foreclosure prevention. "The scope of the arbitration agreement encompassed a broad range of disputes by the use of the phrase 'any controversy.' Plaintiff's Second Amended Complaint (SAC) sought tort damages related to Defendant's alleged fraudulent foreclosure prevention services. Defendant met its initial burden to show the existence of an arbitration agreement and to show that the arbitration agreement covered the disputes alleged in the SAC. The burden shifts to Plaintiff to dispute enforcement of the arbitration agreement. [¶] . . . At issue is a Service Agreement between

6

Plaintiff and Defendant. Plaintiff's arguments as to the Loan/[Deed of Trust] being unenforceable are irrelevant and unpersuasive. [¶] . . . [¶] Plaintiff failed to meet her burden to show that the arbitration agreement is unenforceable. [¶] The motion to compel arbitration is GRANTED."

Defendant PBMC had joined in NACA Law's motion to compel. As to PBMC, the court found: "Co-Defendant Professional Business Management Corporation (PBMC) joined in Defendant's requested relief for arbitration and stay of the action. However, the motion's arguments and attachments are not applicable to PBMC. PBMC is not seen as a contracting party to the arbitration agreement in the Service Agreement or the Service Agreement itself. Without being a contracting party to the arbitration agreement, PBMC failed to meet their initial burden to show that an arbitration agreement exists between PBMC and Plaintiff. [¶] PBMC's Request for Joinder is DENIED."

PMBC also joined a motion to compel arbitration filed by another defendant. In denying the joinder, the court found: "On the motion by defendant PBMC, the court took the matter under submission. The court finds that the joinder is improper as the motion which it joined sought to compel arbitration was on the grounds that there was a contract between the moving defendant and plaintiff. Here, PBMC is seeking to join under the theory of alter ego or the discretionary authority to join a 3rd party, which are different theories. The joinder is denied without prejudice to allow PBMC to file its own, separate motion to compel arbitration."

7

D.    *PBMC's motion*

On July 15, 2024, PBMC filed its own separate motion to compel arbitration.  It provided evidence in the form of a sworn declaration that it "has never provided services to Plaintiff, has never entered into a contract with Plaintiff, and has not had any prior dealings with Plaintiff."  PBMC contended it was "added to this case solely upon the allegations that [PBMC] is a successor, agent and/or alter ego of [NACA Law]."  PBMC argued that because it was joined to the lawsuit as an alter ego and/or agent of a signatory to the agreement, it can enforce the agreement, even as a nonsignatory.

In opposing the motion, Watson contended that a nonsignatory like PBMC can enforce an arbitration agreement only if the plaintiff's claims against the nonsignatory defendant are founded in or inextricably bound up with the obligations imposed by the agreement containing the arbitration clause.  Watson argued that PBMC had a burden to produce evidence regarding the existence, scope and applicability of the agreement to the dispute.  It could not rely on plaintiff's bare "boilerplate agency" allegations in the SAC.  Because PMBC provided no evidence and no specific factual allegations to show its connection to the signatory NACA Law, and its ability to enforce NACA Law's contract as its agent, alter ego or successor, or even its connection to the dispute between plaintiff and NACA Law, Watson contended PBMC failed to shoulder its burden.

On November 14, 2024, the trial court denied PBMC's motion to compel arbitration.  "It is undisputed that the contract at issue containing the arbitration agreement was between Plaintiff and Co-Defendant [NACA Law].  [Citation.]  The express provisions of the contract show that Defendant is not identified

as a contracting party.  Defendant argued that they are alleged to be the successor, agent, or alter ego of NACA as alleged by Plaintiff in the Second Amended Complaint (SAC).  However, the SAC is not verified and is not considered admissible evidence.  Defendant further submitted two declarations . . . .  Neither of the two declarations present any facts to show that Defendant is a successor, agent, or alter ego of NACA.  Because Defendant failed to present any facts to show how they are related to NACA, Defendant failed to meet their initial burden to show the existence of an arbitration agreement with Plaintiff and/or how Defendant is covered under the NACA-Plaintiff arbitration agreement.  Defendant failed to meet their initial burden of proof. [¶] The motion to compel arbitration and stay the action is DENIED.”

This timely appeal followed.

## DISCUSSION

A.    *Standard of Review and Burden of Proof*

“An order denying arbitration is generally reviewed for abuse of discretion.  [Citation.]  The de novo standard of review applies only where the trial court’s denial of a petition to arbitrate presents a pure question of law.” (*Birl v. Heritage Care, LLC* (2009) 172 Cal.App.4th 1313, 1318.)  The burden of proving the existence of a valid arbitration agreement is on the party seeking to compel arbitration.  (*Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 15.)

B.    *Applicable Law*

“Generally speaking, one must be a party to an arbitration agreement to be bound by it or invoke it.” (*Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.* (2005)

9

129 Cal.App.4th 759, 763.) Here the only defendant that is a party to the Service Agreement is NACA Law.

There are limited exceptions to the general rule that a nonsignatory to an agreement cannot be compelled to arbitrate and cannot invoke an agreement to arbitrate, without being a party to the arbitration agreement. (*Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1513.) *Suh* describes six theories by which a nonsignatory may be bound to or may invoke arbitration: incorporation by reference; assumption; agency; veil-piercing or alter ego; estoppel; and third party beneficiary. (*Ibid.*)

Here the SAC alleges that PMBC acted as a "successor, agent, and/or alter ego" of NACA Law, the signatory to the arbitration agreement. It also alleges PMBC acted as a "co-conspirator of each of the other defendants." Of note is that in its motion to compel, PMBC did not supply any factual evidence whatsoever to establish that it is a successor, agent, or alter ego of NACA Law. Nor did it provide evidence that the three remaining exceptions to the general rule apply to it. PMBC presented no evidence to establish why it should be included within NACA Law's arbitration agreement. All it provided was a sworn declaration that it has never done any business at all in any way with plaintiff.

Instead, PMBC contends that the bare allegation of "successor, agent, and/or alter ego" in the SAC is a "judicial admission" and, as such, it is sufficient alone to compel arbitration of Watson's claim against PMBC through the Watson/NACA Law Service Agreement.

But is it? That is the question presented. Relying on *Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446 (*Barsegian*), we conclude it is not.

10

*Barsegian* presents facts very similar to what we have described above. There, the plaintiff wanted to purchase property from defendant Pakravan. (*Barsegian, supra*, 215 Cal.App.4th at p. 449.) Pakravan allegedly recommended the Kessler defendants to represent the plaintiff in the transaction. (*Ibid*.) The plaintiff retained the Kessler defendants to represent her, purchased the property, and eventually faced foreclosure when she was unable to make her loan payments. (*Ibid*.) She later learned that the Kesslers had a pre-existing and long-standing attorney-client relationship with Pakravan, including " 'secretly represent[ing]' " Pakravan in the subject transaction while they purportedly represented the plaintiff. (*Ibid*.) The plaintiff filed suit against Pakravan and the Kessler defendants, alleging that " 'each of the defendants was the principal, partner, co-venturer, agent, servant, trustee, or employee of each of the other defendants herein.' " (*Id.* at p. 451.)

The engagement agreement between the plaintiff and the Kessler defendants contained an arbitration provision. (*Barsegian, supra*, 215 Cal.App.4th at p. 449.) The Kessler defendants moved to compel arbitration of the lawsuit based on that engagement agreement and on the complaint's allegations that the defendants were agents of each other. (*Id*. at pp. 449, 451.)

The trial court denied the Kesslers' motion to compel arbitration because of the possibility of inconsistent rulings resulting from litigation with Pakravan and two other named defendants, none of which were parties to the arbitration agreement. (*Barsegian, supra*, 215 Cal.App.4th at p. 448.) In arguing that the trial court erred, the Kesslers argued that the agency allegation in the operative complaint was a binding

11

judicial admission that gave the other defendants the right to enforce the arbitration agreement between the Kesslers and Barsegian. (*Id.* at pp. 448, 451.)

In affirming the denial of the Kesslers' motion to compel arbitration, the Court of Appeal declined to view the complaint's generic boilerplate agency allegations as judicial admissions, as urged by the Kesslers. It noted that "Prominent treatises, while recognizing that the Supreme Court has described such allegations as 'egregious examples of generic boilerplate' [citation], still advise that 'such allegations may be necessary,' especially 'at the outset of a lawsuit, before discovery.' [Citations.] If the Kessler defendants' argument were sound, then in every multidefendant case in which the complaint contained such boilerplate allegations of mutual agency, as long as *one* defendant had entered into an arbitration agreement with the plaintiff, *every* defendant would be able to compel arbitration, regardless of how tenuous or nonexistent the connections among the defendants might actually be." (*Barsegian*, *supra*, 215 Cal.App.4th at p. 451.)

The court went on to reject the idea that the allegations of the complaint were judicial admissions. A judicial admission " ' "is a *waiver of proof* of a fact by conceding its truth, and it has the effect of removing the matter from the issues." ' " (*Barsegian*, *supra*, 215 Cal.App.4th at p. 452.) "It follows from the foregoing definition of a judicial admission that not every factual allegation in a complaint automatically constitutes a judicial admission. Otherwise, a plaintiff would conclusively establish the facts of the case by merely alleging them, and there would never be any disputed facts to be tried." (*Ibid.*)

12

Instead, "a judicial admission is ordinarily *a factual allegation by one party that is admitted by the opposing party.* The factual allegation is removed from the issues in the litigation because the parties *agree* as to its truth. Thus, facts to which adverse parties stipulate are judicially admitted. [Citation.] Similarly, in discovery when a party propounds requests for admission, any facts admitted by the responding party constitute judicial admissions. [Citations.] And when an answer admits certain factual allegations contained in a complaint or cross-complaint, those facts are likewise judicially admitted." (*Barsegian*, *supra*, 215 Cal.App.4th at p. 452.) "A judicial admission is therefore conclusive both as to the admitting party *and as to the party's opponent.*" (*Ibid*.)

Interestingly, the only factual evidence PMBC submitted in support of its motion was a sworn declaration that it has never at all had any business dealings with plaintiff. It has not conceded or admitted agency, alter ego, or successor status. If its position at trial is consistent with this sworn declaration, then it appears PMBC is poised to deny the agency allegations (and may have already done so in its answer to the complaint, which is not part of the record before us). PMBC has not carried its burden of proving a valid arbitration agreement applicable to it in this dispute.

As one court has opined, it would be unfair to allow one party to "invoke agency principles when it is to his advantage to do so, but to disavow those same principles when it is not. (See Civ. Code, § 3521 ['He who takes the benefit must bear the burden.'].)" (*Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 615 (*Thomas*).) At oral argument, PMBC's counsel confirmed that PMBC's answer denied all allegations of the operative complaint,

13

and PMBC asserts it was not in any way an agent, alter ego or successor of NACA Law.

We note *Thomas* concluded that the agency allegations there were sufficient to permit the nonsignatory defendants to arbitrate under the arbitration contract Thomas had signed. (*Thomas, supra,* 204 Cal.App.4th at pp. 614–615.)  However, in *Thomas*, there was no indication that the nonsignatory defendants intended to deny the agency allegations.  Here, as in *Barsegian*, PMBC admitted it has already denied the agency allegations in its answer to the operative complaint and will continue to do so.  PMBC wishes to hold Watson to the agency allegations only for the purposes of the motion to compel arbitration, but, should it succeed in compelling arbitration on the basis of that allegation, it wishes to retain the right to prove to the arbitrator that the allegation is false.  As the *Barsegian* court explained, "That is not how judicial admissions operate." (*Barsegian, supra*, 215 Cal.App.4th at p. 453.)

## DISPOSITION

The order is affirmed.  Professional Business Management Corporation to pay costs on appeal.

## CERTIFIED FOR PUBLICATION

STRATTON, P. J.

We concur:

WILEY, J.                              VIRAMONTES, J.

14