Filed 3/30/15  Elias v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| MONA ELIAS,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>SOUTHERN COUNTIES OIL CO.,<br><br>    Real Party in Interest. | G050404<br><br>(Super. Ct. No. 30-2012-00563376)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Sheila Fell, Judge.  Petition denied.

deRubertis Law Firm, David M. deRubertis; Law Office of Mann & Elias, Imad Y. Elias and Scott E. Mann for Petitioner.

No appearance for Respondent.

Payne & Fears, Eric C. Sohlgren and Alejandro G. Ruiz for Real Party in Interest.

\*                \*                \*

Mona Elias seeks a writ of mandate directing the trial court to vacate its order compelling arbitration on her claims against her former employer, Southern Counties Oil Co. (SC Fuels). There is no dispute Elias signed an arbitration agreement with SC Fuels, but she contends the trial court erred in applying that agreement to her claims because it applied only to the original employment relationship she formed with SC Fuels in February 2008, and her claims arise out of a second, separate employment relationship formed in August 2009. Elias contends SC Fuels terminated her original employment in October 2008, when she went to work for a related entity, United Fuel & Energy (United Fuel), until SC Fuels rehired her in August 2009. The trial court disagreed, finding Elias had a single, continuous employment relationship with SC Fuels because SC Fuels merely transferred her to United Fuel and then back again.

As explained below, we deny Elias's writ petition because substantial evidence supports the trial court's finding SC Fuels merely transferred Elias to United Fuel, and therefore her employment relationship with SC Fuels continued until the April 2010 termination giving rise to the underlying lawsuit.

I

FACTS AND PROCEDURAL HISTORY

SC Fuels is a large petroleum distributor operating throughout the western United States. In 2007, it purchased a majority interest in publicly-traded United Fuel. SC Fuels and United Fuel then entered into a shared services agreement under which they combined a variety of overhead business services and maintained corporate headquarters in the same office building. Among the services the two companies shared was human resources, with SC Fuels's human resources department handling all personnel matters for both companies.

2

In February 2008, SC Fuels hired Elias as an accounting manager, responsible for handling a variety of financial reports and entries and also supervising three other accounting employees. When she was hired, Elias completed numerous forms including a "Mutual Arbitration Agreement" (Arbitration Agreement), which required her to arbitrate all claims she "may have against the Company or its related entities or employees, arising out of or relating to the employment relationship or termination of employment . . . ."

In October 2008, Elias switched to United Fuel's accounting department, acting as an accounting supervisor to six employees. According to Elias, SC Fuels's Director of Human Resources, Barbara Smith, told her that SC Fuels was terminating her employment and United Fuel offered to hire her as a new employee. Documents in Elias's personnel file show SC Fuels laid off Elias in October 2008, the employer on her paystubs and W-2 forms changed from SC Fuels to United Fuel, and United Fuel required her to complete a job application and numerous other new hire documents before starting the job. United Fuel, however, did not require her to sign an arbitration agreement.

According to SC Fuels, Smith explained to Elias that SC Fuels was transferring her to United Fuel to support its accounting department, and therefore Elias was not required to apply, interview, or go through a selection process. Smith acknowledged Elias was asked to complete some of United Fuel's new hire paperwork because SC Fuels's human resources department maintained separate personnel files for each company's employees. For that reason, United Fuel asked Elias to fill out a job application to provide her basic contact information for the file, but she was not asked to complete the application's other sections regarding her education, work experience, and references. When Elias switched accounting departments, she finished work with SC Fuels on a Friday and the following Monday began working for United Fuel in the same office building.

At her deposition, Smith acknowledged documents in Elias's personnel file referred to SC Fuels laying off Elias and United Fuel hiring her as a new employee, but Smith explained the layoff document and new hire paperwork were just "formalities" necessary to remove Elias from SC Fuels's payroll system and move her to United Fuel's separate system because there was no other appropriate code that could be used. Moreover, in moving from SC Fuels to United Fuel, Elias brought her service time with her, maintained her seniority level, and kept her accrued vacation time and benefits.

In August 2009, SC Fuels's accounting department absorbed United Fuel's accounting department through a merger of the two departments. At that time, SC Fuels became Elias's employer. Instead of the accounting manager or supervisor positions she previously held, Elias became a staff accountant with a reduced salary and no supervisory responsibilities. According to Elias, Smith again told her she was being terminated and rehired. Elias also contends she was required to fill out new hire paperwork to make the switch back to SC Fuels, but she failed to provide copies of the new hire paperwork she claims SC Fuels required her to complete.

According to SC Fuels, it merely transferred Elias back to its accounting department, and did not require Elias to fill out any new hire paperwork because all the policies in effect during her first stint with SC Fuels continued to apply to her employment. In switching back to SC Fuels, Elias again did not miss a single day of work, she maintained her service time and seniority level, and her accrued vacation time and benefits transferred with her. An internal personnel record for SC Fuels identified Elias as a rehire rather than a transfer, but Smith explained the company used that designation because there was no code in SC Fuels's payroll system for a transfer between companies, unlike transfers within departments or divisions. SC Fuels did not require Elias to sign a new arbitration agreement when she resumed working in its accounting department.

4

In January 2010, Elias took an unpaid leave of absence under the Family and Medical Leave Act (29 U.S.C. § 2601 et seq.) for medical reasons. That act required SC Fuels to allow Elias to take up to 12 weeks of unpaid leave with a guaranteed position upon her return. When her protected leave period expired, Elias requested additional time off, but SC Fuels refused. It then terminated her employment at the end of April 2010.

In April 2012, Elias filed this action against SC Fuels alleging a variety of discrimination and wrongful termination claims under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA) and California Family Rights Act (Gov. Code, § 12945.2). SC Fuels promptly filed a petition to compel arbitration based on the Arbitration Agreement Elias signed when the company hired her in February 2008. Elias sought leave to conduct discovery on the manner of shifting her between SC Fuels's accounting department and United Fuel's accounting department, but the trial court denied that request and granted SC Fuels's petition to compel arbitration. Elias filed a petition for writ of mandate with this court and we issued a suggestive *Palma* notice asking the trial court whether it intended to vacate its order granting the petition to compel arbitration and allow Elias to conduct the requested discovery. The trial court elected to do so.

After the parties completed discovery, SC Fuels again petitioned to compel Elias to arbitrate her claims. Elias opposed the petition, arguing the Arbitration Agreement did not apply because her claims arose out of her second employment period with SC Fuels, and the Arbitration Agreement applies only to her original employment period with SC Fuels. The trial court granted SC Fuels's petition, explaining, "[The] Arbitration [A]greement specifically refers to company or its related entities – [United Fuel] and [SC Fuels] are related entities; The fact that [Elias's] job was different at different times or with [United Fuel] versus [SC Fuels] does not change that; [SC Fuels] has established that it continued to be [Elias's] joint employer even after she transferred

to [United Fuel]; [SC Fuels] has sustained its burden of proving (1) the existence of an arbitration agreement, and (2) that the dispute is covered by the agreement." Elias again filed a petition for writ of mandate in this court, and we issued an order to show cause why mandate or other appropriate relief should not issue.

II

DISCUSSION

A.      *Governing Arbitration Principles and Standard of Review*

"A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281.) California has a strong public policy in favor of enforcing arbitration agreements as a cost efficient and expeditious means for parties to resolve their disputes. (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59 (*Avery*); *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1320 (*EFund*).) But arbitration is a matter of contract and the policy in favor of arbitration cannot displace the necessity of a voluntary agreement to arbitrate. "'"'Absent a clear agreement to submit disputes to arbitration, courts will not infer that the right to a jury trial has been waived.' [Citation.]" [Citation.]' [Citation.]" (*Avery*, at p. 59.)

When presented with a petition to compel arbitration, the trial court must determine whether the parties have in fact agreed to arbitrate their dispute. (*Avery*, *supra*, 218 Cal.App.4th at p. 59.) If a valid arbitration agreement exists, the court must order the dispute to arbitration. (Code Civ. Proc. § 1281.2; *EFund*, *supra*, 150 Cal.App.4th at p. 1320.) The party seeking to compel arbitration bears the burden to establish the existence of a valid arbitration agreement. (*Avery*, at p. 59.)

"Given th[e] strong public policy [in favor of arbitration], any doubt as to whether [a] plaintiff's claims come within the arbitration clause must be resolved in favor

6

of arbitration.  [Citations.]  [Indeed,] 'This strong public policy has resulted in the general rule that arbitration should be upheld "unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute. [Citation.]"  [Citation.]'  [Citations.]  The burden is on . . . the party opposing arbitration . . . to show that the arbitration clause cannot be interpreted to cover the claims in the [operative] complaint.  [Citations.]"  (*EFund*, *supra*, 150 Cal.App.4th at pp. 1320-1321; see *Gravillis v. Coldwell Banker Residential Brokerage Co.* (2006) 143 Cal.App.4th 761, 771 (*Gravillis*) ["'Because California has a "'strong public policy in favor of arbitration'" . . . , ". . . arbitration agreements should be liberally interpreted, and arbitration should be ordered unless the agreement clearly does not apply to the dispute in question" . . . . "Doubts as to whether an arbitration [provision] applies to a particular dispute are to be resolved in favor of sending the parties to arbitration." . . .'"].)

In interpreting an arbitration agreement, we apply the ordinary rules of contract interpretation.  (*EFund*, *supra*, 150 Cal.App.4th at p. 1321.)  Our basic goal is to ascertain and give effect to Elias's and SC Fuels's mutual intention at the time of contracting.  (*Avery*, *supra*, 218 Cal.App.4th at p. 60.)  "'We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates.  [Citations.]  We consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation.  [Citation.]  We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage.  [Citation.]  If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs.  [Citation.]'  [Citation.]"  (*Dowling v. Farmers Ins. Exchange* (2012) 208 Cal.App.4th 685, 695 (*Dowling*); see *EFund*, at p. 1321.)

There is no uniform standard of review for evaluating a trial court's decision to grant or deny a petition to compel arbitration.  If the court's decision rests

7

solely on a decision of law, then the de novo standard of review applies. For example, "[i]nterpreting a written document to determine whether it is an enforceable arbitration agreement is a question of law subject to de novo review when the parties do not offer conflicting extrinsic evidence regarding the document's meaning." (*Avery*, *supra*, 218 Cal.App.4th at p. 60; see *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 12 (*Jones*) ["'Whether an arbitration agreement applies to a controversy is a question of law to which the appellate court applies its independent judgment where no conflicting extrinsic evidence in aid of the interpretation was introduced in the trial court'"]; *Gravillis*, *supra*, 143 Cal.App.4th at p. 771.)

On the other hand, "'[w]here the trial court's decision on arbitrability is based upon resolution of disputed facts, we review the decision for substantial evidence. [Citation.] In such a case we must "'accept the trial court's resolution of disputed facts when supported by substantial evidence; we must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of the credibility of witnesses and the weight of the evidence.'" [Citation.]' [Citation.]" (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348; see *Jones*, *supra*, 195 Cal.App.4th at p. 12.)

Here, Elias does not dispute she signed the Arbitration Agreement with SC Fuels; instead, the dispute is whether that agreement applies to Elias's claims. The parties submitted conflicting evidence on whether Elias's switch from SC Fuels's accounting department to United Fuel's accounting department constituted a termination of her employment and a rehiring, or merely a transfer. That conflicting evidence, however, relates to the nature of the change in Elias's employment, not the interpretation of the Arbitration Agreement. We therefore must apply the substantial evidence rule and defer to the trial court's resolution of that conflict in the evidence, but we independently interpret the Arbitration Agreement and determine how it applies to the facts found by the trial court. (*American Federation of State, County & Municipal Employees v.*

8

*Metropolitan Water Dist.* (2005) 126 Cal.App.4th 247, 257 (*American Federation*).) Similarly, we independently determine the legal effect of those facts. (*Glaser, Weil, Fink, Jacobs & Shapiro v. Goff* (2011) 194 Cal.App.4th 423, 443.)

Elias contends the de novo standard should govern our entire review of the trial court's ruling because the extrinsic evidence consisted solely of written declarations and other documentary evidence. According to Elias, appellate courts can weigh and evaluate the credibility of written evidence as well as trial courts, and therefore appellate courts need not defer to the trial court's resolution of any conflicts in written evidence. To support this contention, Elias cites our decision in *Mayhew v. Benninghoff* (1997) 53 Cal.App.4th 1365 (*Mayhew*), which stated, "Since the extrinsic evidence in this case consists entirely of written declarations, we review the arbitration clause de novo and do not consider the statement of decision." (*Id.* at p. 1369.) *Mayhew*, however, did not involve conflicting extrinsic evidence, and therefore did not decide whether an appellate court may disregard the trial court's resolution of conflicting extrinsic evidence. (See *Sino Century Development Limited v. Farley* (2012) 211 Cal.App.4th 688, 696 ["Cases are not authority for propositions not decided"].)

In *Mayhew*, both parties acknowledged they signed a contract including an ambiguous arbitration provision, and the only issue was whether the provision applied to the claims alleged in the underlying complaint. (*Mayhew*, *supra*, 53 Cal.App.4th at pp. 1367-1369.) As noted above, interpreting an arbitration provision is a question of law subject to de novo review unless it depends on conflicting extrinsic evidence regarding the contracting parties' intent. (*Avery*, *supra*, 218 Cal.App.4th at p. 60; *Jones*, *supra*, 195 Cal.App.4th at p. 12.) In *Mayhew*, there was no conflicting extrinsic evidence on the parties' intent, and therefore the court "review[ed] the arbitration *clause* de novo." (*Mayhew*, at pp. 1369-1370, italics added.) That result is consistent with our foregoing analysis.

9

Elias also cites *Patterson v. ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659 (*Patterson*), which states, "If, however, there is no evidence extrinsic to the contract or no conflict in the extrinsic evidence *or the conflicting evidence is entirely written*, a reviewing court is not bound by the finding of the trial court, but instead subjects the contract to independent review." (*Id*. at p. 1663, italics added.) We decline to follow *Patterson* to the extent it permits an appellate court to disregard a trial court's resolution of conflicting evidence simply because the evidence is written as opposed to oral. *Patterson* is inconsistent with well-established Supreme Court precedent, and the authority on which *Patterson* relies does not support its conclusion.

Our Supreme Court has repeatedly held a trial court's judgment or order is entitled to the same deference whether it is based on declarations and written evidence or oral testimony. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711, fn. 3; *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 ["Even though contrary findings *could* have been made, an appellate court should defer to the factual determinations made by the trial court when the evidence is in conflict. This is true whether the trial court's ruling is based on oral testimony or declarations" (original italics)]; *Griffith Co. v. Sand Diego Col. for Women* (1955) 45 Cal.2d 501, 507-508; see *Desert Outdoor Advertising v. Superior Court* (2011) 196 Cal.App.4th 866, 868, fn. 1; *Betz v. Pankow* (1993) 16 Cal.App.4th 919, 923.)

To support a contrary rule, *Patterson* cited *Milazo v. Gulf Ins. Co.* (1990) 224 Cal.App.3d 1528, which stated the same purported rule as *Patterson* without any analysis. (*Patterson*, *supra*, 14 Cal.App.4th at p. 1663) As the authority for its rule, *Milazo* cited *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 529, and *Estate of Shannon* (l965) 231 Cal.App.2d 886, 890-891. (*Milazo*, at p. 1534.) *Coopers & Lybrand* does *not* authorize an appellate court to disregard a trial court's decision resolving conflicts in extrinsic evidence. Instead, that decision states the well established rule to the contrary: an appellate court may independently interpret a contract only when

10

there is no extrinsic evidence or there is no conflict in the extrinsic evidence. (*Coopers & Lybrand*, at p. 529.) In *Estate of Shannon*, the Court of Appeal suggested an appellate court is in a better position than a trial court to review written evidence, but it cited no authority to support its observation. More importantly, the appellate court's comments on reviewing extrinsic evidence were dicta because the court did not face an issue involving extrinsic evidence. (See *Estate of Shannon*, at pp. 890-891.) Accordingly, we review the trial court's factual findings for substantial evidence, but independently interpret the Arbitration Agreement.

B.      *The Trial Court Did Not Err in Granting SC Fuels's Petition to Compel Arbitration*

Elias contends the trial court erred in ordering her to arbitrate her claims because those claims arise out of her second employment period with SC Fuels, and the Arbitration Agreement does not apply to that separate employment relationship. According to Elias, the Arbitration Agreement applies only to the original employment relationship she formed with SC Fuels when she signed the Agreement, and that relationship ended in October 2008 when SC Fuels terminated her and she joined United Fuel.

Elias's challenge presents two separate issues. The first is a contract interpretation issue—to what employment relationship does the Arbitration Agreement apply? The second is a factual question—did Elias's employment relationship with SC Fuels end when she switched from SC Fuels's accounting department to United Fuel's accounting department? We separately address each of these questions.

1.      The Arbitration Agreement Applies Only to the Employment Relationship Formed When Elias Signed the Agreement

The Arbitration Agreement states, "If any legally actionable dispute arises that cannot be resolved by mutual discussions between the Company and I, we agree to exclusively resolve that dispute by final and binding arbitration before an arbitrator

11

experienced in employment law.  Both the Company and I agree that this agreement to arbitrate covers all claims that the Company may have against me, or that I may have against the Company or its related entities or employees, arising out of or relating to the employment relationship or termination of employment . . . ."

Elias focuses on the language in the second sentence stating she must arbitrate all claims she may have against SC Fuels "arising out of or relating to the employment relationship or termination of employment."  She contends the plain meaning of this language limits the Arbitration Agreement to "the employment relationship" she formed with SC Fuels at the time she signed the Agreement.  SC Fuels, however, focuses on the language in the first sentence requiring Elias to arbitrate "any legally actionable dispute [that] arises . . . between [SC Fuels] and [Elias]."  According to SC Fuels, this language requires Elias to arbitrate her claims in the "broadest possible terms," and therefore requires her to arbitrate "<u>any</u> legal dispute between [Elias] and SC Fuels or its related entities at <u>any</u> time."  (Original underscoring.)

To support its interpretation, SC Fuels cites cases that conclude contractual language requiring parties to arbitrate "'*[a]ny* dispute or other disagreement arising from or out of this . . . Agreement'" must be broadly construed to require the parties to arbitrate not only all contract claims, but also all tort claims arising out of the parties' contractual relationship.  (See *EFund*, *supra*, 150 Cal.App.4th at p. 1322, original italics; see also *Izzi v. Mesquite Country Club* (1986) 186 Cal.App.3d 1309, 1315-1317 ["'In the particular situation where contracts provide arbitration for "'any controversy . . . arising out of or relating to the contract . . .'" the courts have held such arbitration agreements sufficiently broad to include tort, as well as contractual, liabilities so long as the tort claims "*have their roots in the relationship between the parties which was created by the contract*"'" (italics added)].)  These cases are inapposite because they address whether the parties agreed to arbitrate certain claims, and we are not confronted with that issue.  Instead, we must decide whether the parties intended to apply the Arbitration

12

Agreement only to the employment relationship SC Fuels and Elias initially formed in February 2008, or whether they intended it to apply to any employment relationship between SC Fuels and Elias no matter when it was formed  The nature of the claim is irrelevant to that question.

To determine the parties' intent, we look to the plain meaning of the words they used, the circumstances under which they made their contract, and the matter to which the contract relates.  (Civ. Code, §§ 1638, 1639, 1647; *Dowling*, *supra*, 208 Cal.App.4th at p. 695.)  We focus on their intent at the time of contracting, not when the dispute arose.  (Civ. Code, § 1636.)  Here, the Arbitration Agreement requires the parties to arbitrate any claims arising out of or relating to "*the* employment relationship." (Italics added.)  The parties' use of the word "the" is significant because it is a definite article that refers to a specific person or thing.  In contrast, use of indefinite articles like "a," "an," or "any" signals a more general or generic reference.  (*Honchariw v. County of Stanislaus* (2013) 218 Cal.App.4th 1019, 1034.)  The only relationship the parties had when they entered into the Arbitration Agreement was the employment relationship they formed at the same time Elias executed the Agreement.  Moreover, the circumstances surrounding the Arbitration Agreement and the matter to which it relates pertain only to the same employment relationship formed in February 2008.  Nothing in the Arbitration Agreement or the surrounding circumstances suggests the parties contemplated an employment relationship other than the one they initially formed, and SC Fuels cites no extrinsic evidence showing the parties intended the Arbitration Agreement to apply to some other, yet unformed employment relationship the parties did not anticipate. (Cf. *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 579-580 [arbitration agreement between patient and chiropractor applied to treatment patient received for a separate, unrelated condition two years after signing agreement because agreement's plain language expressed intent to cover future treatments by stating "'[t]his agreement is

13

intended to bind the patient and the health care provider . . . who now *or in the future* treat[s] the patient . . .'" (original italics)].)

The broad language in the Arbitration Agreement's first sentence must be read together with the language in the second sentence limiting the Agreement to the parties' current employment relationship. (Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"].) Moreover, no matter how broad the language of that first sentence, we may not extend it to any matter about which the parties did not intend to contract. (Civ. Code, § 1648 ["However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract"].) As explained above, nothing in the Arbitration Agreement's language or the surrounding circumstances suggest the parties intended to apply the Arbitration Agreement to a different employment relationship that did not exist. Under SC Fuels's interpretation, the Arbitration Agreement would apply if it terminated Elias and she was injured 25 years later by an SC Fuels truck. Absent supporting language or evidence, we may not read the Arbitration Agreement so broadly.

We interpret the Arbitration Agreement as applying only to the employment relationship SC Fuels and Elias formed in February 2008 when she signed the Agreement. This is only half of the analysis, however. We must next determine whether that relationship ended when she switched to United Fuel's accounting department in October 2008, or continued until SC Fuels finally terminated her employment in April 2010.

2. Substantial Evidence Supports the Trial Court's Finding Elias and SC Fuels Had a Single, Continuous Relationship

Elias contends the original employment relationship subject to the Arbitration Agreement ended in October 2008 when SC Fuels terminated her employment and United Fuel hired her, and therefore the Agreement does not apply to

14

her claims arising out of her relationship with SC Fuels that started in August 2009. The trial court, however, found SC Fuels did not terminate Elias in October 2008, and its relationship with her continued until April 2010. We must defer to those findings because they are supported by substantial evidence.

As explained above, we review the trial court's factual findings under the substantial evidence standard. (*American Federation*, *supra*, 126 Cal.App.4th at p. 257.) Under that standard, ""''"the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the [trial court's] determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." . . .' [Citation.]" (*Whitney v. Montegut* (2014) 222 Cal.App.4th 906, 912, italics omitted.) "Evidence is substantial if it is of 'ponderable legal significance . . . reasonable, credible and of solid value.' [Citation.]" (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292.)

In granting SC Fuels's petition to compel arbitration, the trial court specifically found SC Fuels "transferred" Elias from SC Fuels to United Fuel; she was not terminated and then hired. Implied in this finding and the court's decision to grant the petition is the additional finding that Elias's employment relationship with SC Fuels did not end when she was transferred, but continued until she was terminated in April 2010. (*Hotels Nevada*, *supra*, 203 Cal.App.4th at p. 348 ["""""we must presume the court found every fact and drew every permissible inference necessary to support its judgment [or order]"""""]; *Jones*, *supra*, 195 Cal.App.4th at p. 12 [same].)

The existence of a single, continuous employment relationship is supported by the undisputed evidence showing each time Elias moved between SC Fuels's and

15

United Fuel's accounting departments she maintained her service time and seniority level, and her accrued vacation time and sick leave transferred with her. If SC Fuels and United Fuel terminated Elias's employment and formed a new employment relationship each time Elias moved, SC Fuels and United Fuel would have paid Elias for her accrued vacation time. (Lab. Code, § 227.3 [when employee is terminated all vested vacation time must be paid as wages].)

Moreover, if there was not a single, continuous employment relationship, Elias would not have been entitled to the 12-week leave of absence she took under the federal Family and Medical Leave Act, which requires an employer to grant leave only if the employee has worked at least 1,250 hours during the 12-month period immediately preceding the leave. (29 C.F.R. § 825.110(a)(2) (2013).) If Elias started a new employment relationship when she returned to SC Fuels in August 2009, she would not have worked the required 1,250 hours by the time she started her leave in January 2010. Indeed, without a single continuous employment relationship that combines the time she worked during her second stint with SC Fuels and her time with United Fuel, Elias's cause of action for violation of the California Family Rights Act would not survive. (See Gov. Code, § 12945.2.)

Undisputed evidence regarding the relationship between SC Fuels and United Fuel also supports the existence of a single, continuous employment relationship. Before Elias went to work for SC Fuels, it bought a majority and controlling interest in United Fuel. Under a shared services agreement SC Fuels and United Fuel occupied the same corporate headquarters and shared various overhead business services, including human resources. That is why Elias dealt with the same human resources personnel when SC Fuels hired her, when she transferred to United Fuel, and when she transferred back to SC Fuels. Elias returned to SC Fuels when SC Fuels absorbed United Fuel's accounting department and began performing all accounting services for United Fuel. Consistent with the intertwined nature of the relationship between SC Fuels and United

16

Fuel, the Arbitration Agreement requires Elias to arbitrate all employment claims not only with SC Fuels, but also its related entities.

To support her contention she had two separate employment relationships with SC Fuels, Elias relies on her declaration asserting that Smith told her SC Fuels would terminate her employment and United Fuel would hire her as a "new hire" in October 2008. Her declaration also states Smith again told her she was being terminated and rehired when she switched accounting departments in August 2009. In support, Elias points to documents in her personnel records stating SC Fuels laid off Elias in October 2008, numerous other documents from United Fuel identifying her as a new hire, and her paystubs and W-2 forms showing her employer switched from SC Fuels to United Fuel and then back to SC Fuels.[1]

Smith's declaration, however, states that each time Elias moved from one accounting department to another Smith told Elias she was being transferred, not terminated. Smith explained at her deposition that the documents in Elias's personnel files were just "formalities" required to close Elias out of one payroll system and add her to another one because there was no other appropriate code to use. Smith also explained Elias was never required to apply, interview, or go through a selection process for her position at United Fuel or when she returned to SC Fuels. Finally, Smith explained Elias was not required to complete any new hire paperwork when she returned to SC Fuels because she still was subject to the same policies that were in effect when she began working in SC Fuels's accounting department. In finding Elias had been transferred, the

---

[1] At oral argument, Elias also argued the Arbitration Agreement was superseded by an agreement with United Fuel she signed as part of her new hire paperwork. She pointed to an integration clause in that agreement, stating it superseded all prior agreements between the parties. This agreement, however, was a confidentiality agreement, not an employment agreement, and the integration clause stated the confidentiality agreement superseded all prior agreements between United Fuel and Elias "with respect to the subject matter [of the confidentiality agreement]."

trial court resolved this evidentiary conflict in the evidence in SC Fuels's favor and we must defer to that determination. (*In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1254.)

In upholding the trial court's conclusion that the Arbitration Agreement applies to Elias's claims, we do not reach the court's additional finding SC Fuels was Elias's "joint employer" during the period she worked in United Fuel's accounting department, and therefore SC Fuels's employment relationship with Elias did not end when Elias switched departments. The findings that Elias was transferred, and therefore her relationship with SC Fuels did not end, support the trial court's ruling without the additional joint employer finding.

We simply note the authority on which SC Fuels and the trial court relied for the joint employer issue—*Vernon v. State of California* (2004) 116 Cal.App.4th 114—addressed a significantly different question than whether SC Fuels and Elias continued to have an employment relationship when she was moved to United Fuel. In *Vernon*, the court examined a variety of factors to determine whether an entity exercised sufficient control over an employee's performance to justify holding the entity liable under the FEHA even though it was not the employee's direct employer. (*Vernon*, at pp. 124-126.) Here, we simply determine whether substantial evidence shows the existence of a continuous employment relationship, not how significant that relationship must be to justify imposing liability for unlawful employment actions.[2]

---

[2] For similar reasons, we do not find applicable the authority on which Elias relied—*Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, disagreed with on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 524. *Laird* addressed the showing an employee must make to hold a parent corporation liable for the acts or omissions of its subsidiary on the theory the two corporate entities constitute a single employer despite the presumption they are separate legal entities. (*Laird*, at p. 737.)

18

## III

### DISPOSITION

The petition is denied.  SC Fuels shall recover its costs on this writ proceeding.

ARONSON, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

BEDSWORTH, J.