Filed 6/22/22  Yee v. Cambridge Healthcare Services CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| CHIA LI YEE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CAMBRIDGE HEALTHCARE SERVICES, LLC, et al.,<br><br>Defendants and Appellants. | B309125<br><br>Los Angeles County<br>Super. Ct. No.<br>20STCV24327 |

APPEAL from an order of the Superior Court of Los Angeles County, Rupert A. Byrdsong, Judge.  Affirmed.

Levinson Arshonsky & Kurtz and Nathan T. Lowery; Valensi Rose and David Krol for Defendants and Appellants.

Shegerian & Associates, Carney R. Shegerian and Jill McDonell for Plaintiff and Respondent.

———————————

Cambridge Healthcare Services, LLC (Cambridge),[1] AG San Gabriel, LLC dba Broadway Healthcare Center (Broadway), and Wayne Sanner, Cambridge's Chief Operating Officer (COO), appeal from the trial court's order denying their petition to compel arbitration of Chia Li Yee's employment discrimination and retaliation complaint.  We affirm.

### FACTS AND PROCEDURAL BACKGROUND

Cambridge is "a management and consulting firm that works with 38 post-acute and long-term healthcare facilities throughout California."  Cambridge colloquially refers to those separate facilities as " 'sister-facilities.' "  Broadway, AG Seal Beach, LLC dba Seal Beach Health and Rehabilitation Center (Seal Beach), and KF Ontario, LLC dba Ontario Healthcare Center (Ontario) are all healthcare facilities that use Cambridge's services.  One of those services is "management placement."

On March 19, 2018, Yee applied in writing, and was hired, for an "administrator-in-training" position for Seal Beach. Cambridge's COO at the time hired Yee.[2]  According to Sanner, when Yee started working for Seal Beach, "the purpose was to train her to be an administrator so that she could take over as needed at another Cambridge-affiliated facility."  He declared "Cambridge regularly transfers management personnel between facilities to meet each facility's needs."

When Yee was hired, she was given an employee handbook containing an arbitration provision.  Yee signed an

---

[1]    Respondent incorrectly named Cambridge as "Cambridge Health Services, LLC."

[2]    Sanner became Cambridge's COO in November 2018.

2

"Acknowledgement of Policies, Rules and Agreement for At-Will Employment and Arbitration" (acknowledgment form) stating she had received a copy of Seal Beach's employee handbook and understood her employment with Seal Beach was at-will. By signing the form, Yee also agreed to arbitrate "any dispute, controversy or claim arising out of or relating to [her] employment relationship with Seal Beach . . . as described in the '[a]rbitration [a]greement' section of th[e] handbook."

The introduction to the Seal Beach employee handbook explains it is "to provide you with information about conditions of your employment at [Seal Beach]," and defines Seal Beach as "the 'Facility.'" Employees are "required to . . . comply with the provisions of [the] [h]andbook." The introduction also states, "Seal Beach . . . is your sole employer." It explains, "Sometimes you may see forms or documents as part of your employment where the name of one of our consulting resource companies or organizations is listed, or where a payment account for your payroll might be set up under another name. However, your sole employer is Seal Beach."

The handbook includes a section entitled, "Arbitration Agreement." That section in part provides:

> "[A]ny dispute, controversy or claim between us [meaning Seal Beach and the employee], including without limitation, contract claims, tort claims, breach of duty claims, wrongful termination claims, wage claims, claims of discrimination or harassment (whether in the hiring process or after employment) and all other common law and statutory claims, including all claims based

upon federal or state civil rights laws, including claims under the EEOC, FEHA or otherwise (collectively 'Claims'), to the extent the law provides Claims may be arbitrated, shall at the request of either the employee or the Facility be submitted to and settled by binding arbitration. . . . Such arbitration shall include any Claims you have against the Facility or any of its officers, managers, employees, supervisors, agents or owners."

Around November 2018, Yee was transferred to Ontario as an administrator. Maria Corazon Johnson, the director of staff development (DSD) for the Seal Beach facility "pouched" Yee's personnel file to Ontario at Yee's request. Johnson explained she copied the entire file, which included the arbitration agreement, and put it in an envelope; a person then picked it up to deliver to Ontario. The then-DSD at Broadway, Li Fang Jou, explained "pouch[ing]" was the "system between the facility and the resource center [Cambridge]." She said that if she sent something to another facility, she would "pouch" it to the "resource center [Cambridge], and . . . [t]hey will pouch to the other facility. That's how we communicate."

Yee declared she received an Ontario employee handbook that also included an arbitration agreement. She did not sign that agreement.

On March 28, 2019, Yee was transferred to Broadway. Yee declared she was given an employee handbook for that facility as well. She did not sign the acknowledgement. Jou testified at her deposition that she provided new employees with the arbitration agreement by giving them a copy of the employee

4

handbook to read before orientation.[3] Yee "was hired by the resource center," meaning "[Broadway's] consulting company," Cambridge. Yee did not go through orientation. Jou said she did not give Yee a copy of the Broadway employee handbook because Yee came from another facility. The handbook was available on the computer system, however. It appears to be the same as the Seal Beach handbook, except that it substitutes Broadway for Seal Beach. Johnson, the Seal Beach DSD, testified Cambridge prepared the arbitration policy, including the acknowledgement form. She kept employees' signed acknowledgement forms at the Seal Beach facility.

On June 26, 2020, Yee sued Cambridge, Broadway, and Sanner alleging claims for discrimination, harassment, retaliation under FEHA (Gov. Code, § 12900 et seq.), and wrongful termination, among others.[4] Yee alleged Sanner transferred her to Broadway from Ontario after she complained about an employee having filed fraudulent expense reports. She allegedly was told she was being transferred to Broadway because "it was the 'Chinese building.'"

After Yee started working at Broadway, she learned a male administrator was being paid more than she was. She complained to her supervisor who said she'd discuss the matter with Sanner. Yee also allegedly questioned why nursing staff were prohibited from wearing personal protective equipment recommended in response to the COVID-19 pandemic. Nurses

---

[3] Jou testified as Broadway's person most knowledgeable (PMK) about Broadway's arbitration agreement.

[4] Yee sued Sanner for harassment and intentional infliction of emotional distress only.

5

also allegedly had too many patients during this time, leading Yee allegedly to complain to Sanner that the understaffing was endangering patients and nurses. The complaint alleges Sanner humiliated Yee in front of other employees during a strategy meeting after she complained about the gender pay gap, and defendants terminated her employment as part of an asserted " 'corporate restructuring,' " after she complained about patient safety and "illegal conduct."

Through their respective counsel, defendants demanded Yee arbitrate her claims and Yee refused. In lieu of answering the complaint, defendants filed a petition to compel arbitration and stay further proceedings, and for attorney fees and costs. Yee opposed the petition. On October 28, 2020, the court convened a hearing on defendants' petition.

Defendants argued the arbitration agreement Yee signed with Seal Beach applied to her claims against all defendants because they all were affiliated with one another, as well as each other's agent; and Cambridge and Sanner were expressly referenced in the arbitration agreement as managers of the facilities, including Seal Beach. Defendants also asserted the transfer of Yee's personnel file and signed arbitration agreement from Seal Beach to Ontario and then to Broadway demonstrated the parties understood they would be bound by the arbitration agreement wherever Yee might be transferred—that the signed agreement "moves from facility to facility for the upper level management."

Yee opposed the petition, arguing no valid arbitration agreement existed between her and defendants, as neither she nor Broadway signed Broadway's acknowledgement form agreeing to arbitration, and defendants were not parties to

6

the Seal Beach arbitration agreement. She argued defendants could not enforce Seal Beach's arbitration agreement because defendants did not have an identity of interest with Seal Beach, defendants were not third party beneficiaries of Seal Beach's agreement, and equitable estoppel did not apply. Yee also argued defendants' delay in producing the signed Seal Beach arbitration acknowledgement form, after she had requested her personnel file from them, should result in a waiver of arbitration, and the Seal Beach arbitration agreement was unconscionable.

On October 28, 2020, after hearing argument, the trial court denied defendants' petition and issued a statement of decision. The court found the arbitration agreement Yee signed was for an employer—Seal Beach—that was not a party to the lawsuit, and the evidence did not demonstrate the arbitration agreement would apply to any other facility or affiliate. The court also found defendants did not establish Cambridge and Sanner were agents or managers of Seal Beach. The court was "not convinced" defendants—who were not signatories to the arbitration agreement—could enforce it under theories of agency or assumption or as third party beneficiaries. The court thus did not consider Yee's unconscionability or waiver arguments. The court entered a separate, signed order denying defendants' petition to compel on October 30, 2020. Defendants timely appealed.[5]

## DISCUSSION

Defendants contend they may enforce the Seal Beach arbitration agreement to compel Yee to arbitrate her claims

---

[5] An order denying a petition to compel arbitration is immediately appealable. (Code Civ. Proc., § 1294, subd. (a).)

7

based on their affiliation with Seal Beach; Cambridge and Sanner's status as Seal Beach's managers—disputes as to whom the agreement expressly applies; and as nonsignatories to the agreement under agency, equitable estoppel, third party beneficiary, and assumption principles.

1.    ***Applicable law and standards of review***

"A party to an arbitration agreement may petition the court to compel other parties to arbitrate a dispute that is covered by their agreement." (*Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 15 (*Jones*).) "Although there is general policy favoring arbitration, a party cannot be compelled to accept arbitration of a controversy which they have not agreed to arbitrate." (*Garcia v. Expert Staffing West* (2021) 73 Cal.App.5th 408, 413 (*Expert Staffing*).) Thus, the party who moves to compel arbitration bears the burden of proving the existence of a valid arbitration agreement covering the dispute. (*Jones,* at p. 15.)

Generally, only a party to an arbitration agreement may enforce it. (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352 (*DMS Services*); *Jarboe v. Hanlees Auto Group* (2020) 53 Cal.App.5th 539, 549 (*Jarboe*).) In limited circumstances, nonsignatories to an agreement containing an arbitration provision may compel arbitration of "a dispute arising within the scope of that agreement." (*DMS Services*, at p. 1353.) As relevant here, courts have recognized nonsignatories' ability to do so (or to be bound by an arbitration agreement) under theories of " ' "incorporation by reference;[6] [ ] assumption; [ ] agency; . . .

---

6    We note the case law's reference to "incorporation by reference" appears to refer to situations where the nonsignatory has entered into a separate agreement with the party that incorporates the agreement containing the arbitration provision

8

[equitable] estoppel; and [ ] third-party beneficiary." ' " (*Ibid.*, citing *Suh v. Superior Court, supra,* 181 Cal.App.4th at p. 1513, fn. omitted.) These exceptions generally apply where there is a relationship between the nonsignatory and the signatory—such as an employment or agency relationship—" 'where a sufficient "identity of interest" exists between them.' " (*DMS Services*, at p. 1353.)

 " 'Whether an arbitration agreement applies to a controversy is a question of law to which the appellate court applies its independent judgment where no conflicting extrinsic evidence in aid of interpretation was introduced in the trial court. [Citation.]' [Citations.] [¶] However, if there are material facts in dispute, we must accept the trial court's resolution of such disputed facts when supported by substantial evidence. [Citation.] We also must presume the court found every fact and drew every permissible inference necessary to support its judgment or order, and we must defer to the court's determination of credibility of the witnesses and weight of the evidence in resolving such disputed facts." (*Jones, supra*, 195 Cal.App.4th at p. 12.)

 The parties here dispute the applicable standard of review, apparently disagreeing as to whether the trial court resolved

---

by reference. (See *Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1513, citing *Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784, 790–791[enforcing arbitration agreement against nonsignatory plaintiff where it was incorporated by reference in agreement plaintiff signed].) Defendants do not invoke the theory in this way. Rather, they argue the Seal Beach arbitration agreement's reference to "managers" incorporates Cambridge and Sanner by reference.

any disputed facts in denying defendants' petition. To the extent the court did, we accept the court's factual findings if substantial evidence supports them. Finally, we review the trial court's ruling, not the reasons for its ruling; if correct on any theory presented by the record, we will affirm. (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 481, fn. 5.)

2. ***The Seal Beach arbitration agreement only covers disputes stemming from Yee's employment relationship with Seal Beach***

Our " ' "first task" ' " is to determine whether Yee and defendants agreed to arbitrate her claims against them. (*Jarboe, supra*, 53 Cal.App.5th at p. 548.) To do so, we apply general contract law principles to construe the arbitration agreement at issue. (*Ibid.*; *Jones, supra*, 195 Cal.App.4th at p. 16; see also *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 [" '[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate' "].)

The basic goal of contract interpretation is to give effect to the parties' intent at the time they entered the contract. (*Expert Staffing West, supra*, 73 Cal.App.5th at pp. 412–413; Civ. Code, § 1636.) When the language is clear and explicit, it governs our interpretation, and we give the words of the agreement their ordinary and "popular" meaning. (Civ. Code, §§ 1638, 1644.) We consider the contract as a whole, "giv[ing] effect to every part, if reasonably practicable, each clause helping to interpret the other." (*Id.*, § 1641.) Moreover, when the drafter "has prepared an arbitration provision whose application to a particular dispute is uncertain, ordinary contract principles

require that the provision be construed against the drafter's interpretation and in favor of the nondrafter's interpretation." (*Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 248 [where written agreement has been prepared entirely by the employer, "it is a 'well established rule of construction' that any ambiguities must be construed against the drafting employer and in favor of the nondrafting employee"], but see *Lamps Plus, Inc. v. Varela* (2019) 587 U.S. __ [139 S.Ct. 1407, 1413, 1417–1419] [holding court cannot apply doctrine stated in *Sandquist* to infer from ambiguous agreement that parties consented to class arbitration].)

It is undisputed that the only arbitration agreement Yee signed was with Seal Beach, who is not a party to this litigation. That arbitration agreement, as defendants acknowledge, consists of the arbitration provision in the Seal Beach handbook and the acknowledgement form Yee signed. Accordingly, we must read the handbook and acknowledgement together to determine the parties to, and scope of, the agreement.

First, as used in the handbook—including the arbitration provision—the "Facility" means Seal Beach. The handbook also unambiguously states—more than once—that Seal Beach is the employee's (Yee's) "sole employer." The arbitration provision lists various claims subject to arbitration at the request of either the employee—here, Yee—or the Facility—referring to Seal Beach. As the trial court noted, the causes of action Yee asserts in her complaint are the type of claims subject to the arbitration provision. The provision also provides that arbitration shall apply to Yee's claims against the Facility—again, Seal Beach— "or any of its officers, managers, employees, supervisors, agents or owners." (As we discuss below, it is this statement that

11

defendants contend expressly allows Cambridge and Sanner to compel Yee to arbitration.)  Yet, the handbook's description of arbitrable claims must be read in conjunction with the acknowledgement Yee signed.  According to that acknowledgement, Yee expressly agreed to arbitrate "any dispute, controversy or claim *arising out of or relating to my employment relationship with Seal Beach* . . . as described in the '[a]rbitration [a]greement' section of this handbook." (Italics added.)

Reading the agreement in its entirety, the plain language makes clear the arbitration agreement is between Yee and Seal Beach, and requires Yee to arbitrate claims against Seal Beach or its managers, agents, etc., that *arise out of or relate to Yee's employment relationship with Seal Beach.*  Yet, Yee's claims against defendants are not based on her employment with Seal Beach.  None of the complaint's allegations involves unlawful conduct during the hiring process at Seal Beach, during Yee's employment with Seal Beach, or relating to Yee's transfer from Seal Beach to Ontario.  Rather, all of Yee's claims stem from her employment with Broadway or transfer to Broadway from Ontario.  Yee alleges she was discriminated against, harassed, or retaliated against while employed at Broadway (or to some extent, Ontario)—not Seal Beach.  Nor does she allege the tortious conduct defendants engaged in was related to her employment with or any work she did for Seal Beach, was done on behalf of Seal Beach, or was done for Seal Beach's benefit.  As Yee's agreement to arbitrate is expressly limited to claims arising out of or relating to her employment relationship with Seal Beach, none of Yee's causes of action falls within its scope.

12

Despite this express limitation, defendants argued to the trial court, as they essentially do now, that Yee, an upper-management employee, understood she would be bound by the Seal Beach arbitration agreement at any Cambridge-affiliated facility to which she might transfer, including Broadway. They note, as they did below, that Yee was hired at Seal Beach specifically to train to become an administrator so that she could be transferred to other Cambridge-affiliated facilities, as needed. And, when Yee moved to another facility, the facility sent her personnel file with the signed arbitration agreement to Cambridge, who transferred it to the new facility.[7]

Defendants also contend there is no dispute that Cambridge "controlled a significant aspect" of Yee's employment relationship with Seal Beach. Defendants note Yee herself alleges she was "transferred" between facilities, declared she "was moved" to Ontario, and does not dispute that it was Cambridge who transferred or moved her. They also assert Yee concedes in her respondent's brief that Cambridge provided some human resources services for Seal Beach and the other Cambridge-affiliated facilities. Defendants thus argue these "admissions," supported by Sanner's declaration that Cambridge regularly transfers "management personnel" between " 'sister facilities,' " establish Cambridge exercised "significant control over a critical aspect" of Yee's employment.

Defendants would have us read "arising out of or relating to [Yee's] employment relationship with Seal Beach" to mean Yee's "employment relationship" with *any* Cambridge-affiliated facility

---

[7] The Seal Beach DSD testified she sent the personnel file to Ontario when Yee moved at Yee's request, however.

13

based on the mere fact the facilities are related to each other as recipients of Cambridge's management services and the nature of those services. We cannot. Rather, we conclude the Seal Beach arbitration agreement " 'is not susceptible of an interpretation that covers' " disputes arising out of or related to Yee's employment relationship with other Cambridge-affiliated facilities. (*Expert Staffing, supra*, 73 Cal.App.5th at p. 413.)

First, as we discussed, the plain language of the agreement is limited specifically to Yee's employment relationship with Seal Beach. Second, as the trial court noted, had Cambridge— the purported drafter of the arbitration agreement[8]—intended the agreement "to encompass" itself and any "sister" or "affiliated" facilities as parties, it easily could have added language to that effect. It did not. (See *Jones, supra*, 195 Cal.App.4th at p. 17 [rejecting application of arbitration provision to claims against nonsignatory defendants, noting "it would have been a simple matter" for signatory, who supplied the form arbitration agreement and was related to nonsignatories, "*at the time of contracting* to have broadened the arbitration agreement to include within its scope other [related] parties"].) There is no language in the arbitration agreement, or anywhere else in the handbook for that matter, identifying other related, "sister," or "affiliated" facilities. Nor does the agreement state, as the trial

---

[8] Cambridge asserts it "creates and provides" an employee handbook for its affiliated facilities, including the arbitration provision and acknowledgement form. Johnson testified "[t]he management company," meaning Cambridge, drafted the policy and procedure regarding arbitration. According to Cambridge, all of its affiliated facilities "use the same handbook and arbitration agreement."

14

court noted, the parties understand the arbitration agreement will apply to any facility to which the employee might transfer.

Moreover, as the trial court found, the evidence demonstrates "each facility is a separate employer or entity and was not meant to be connected to Seal Beach":  filings with the Secretary of State, of which the trial court took judicial notice, establish Seal Beach, Ontario, Broadway, and Cambridge each are separately formed limited liability companies; Yee declared she was given different email addresses depending on her employer—at Seal Beach her address was "Chia.Yee@ sealbeachhcc.com," but at Broadway her address was "Chia. Dermurjian@broadwayhcc.com"; Yee's paystub from Ontario and W-2 form from Broadway reflect different employers; and defendants' designated PMKs for Seal Beach and for Broadway were not the same person.[9]

Significantly, at each facility where Yee worked, she was given a *separate* employee handbook that included an arbitration provision with an acknowledgement form.[10]  Each facility's handbook—as well as the acknowledgement form for employees to indicate their agreement to arbitration—limit their application

---

[9]      Indeed, Johnson, the DSD and designated PMK for Seal Beach, testified she had never been to the Broadway facility.

[10]      Jou testified she did not give Yee a handbook for Broadway. Yee, on the other hand, declared she "was provided with a new handbook for [Broadway]."  We presume the trial court resolved any inconsistencies in these statements in Yee's favor and defer to the court's credibility findings.  (*Jones, supra*, 195 Cal.App.4th at p. 12.)

to the specific facility.[11]  The Broadway handbook thus identifies the employee's "sole employer" and the "Facility," as Broadway. And, in the same vein as the Seal Beach form, Broadway's acknowledgement form states the signing employee agrees to arbitrate claims "arising out of or relating to [the employee's] employment relationship with Broadway."  Sanner also had to sign an arbitration agreement as part of his employment with Cambridge, and it too limits arbitration to any claim "arising out of or relating to [his] employment relationship with Cambridge." It is undisputed, however, that Yee never signed an arbitration agreement with Broadway or Cambridge, and Cambridge never employed Yee.

We agree with the trial court's view of this evidence.  There would be no reason for Cambridge to draft arbitration provisions limited to each specific facility—without mentioning their applicability to other Cambridge-affiliated facilities or itself— if an employee's agreement to arbitrate with one facility meant an agreement to arbitrate with all.

*Jarboe* is instructive.  There, separate auto dealerships, that were affiliated with each other under an auto dealership group, could not compel an employee to arbitrate his individual wage and hour claims against them based on an agreement to arbitrate included in an employment contract the employee

---

[11]  Although the record does not include the handbook and acknowledgement form for Ontario, given defendants assert Cambridge provides its facilities with the same handbook and acknowledgment, we assume Ontario's similarly were limited in their applicability to Ontario.

16

signed with only one of the dealerships.[12] (*Jarboe, supra*, 53 Cal.App.5th at pp. 543–546.) The nonsignatory defendants were unable to enforce that agreement despite the fact the employee "was transferred"—like Yee—from the signatory dealership to a nonsignatory dealership where he worked until his termination. (*Id.* at p. 546.) There was no basis to conclude the employee intended the arbitration provision in his integrated employment contract would apply to any defendant other than the employer named in it. (*Id.* at pp. 551–552.)

Similarly, given the arbitration agreement Yee did sign is expressly limited to claims stemming from her employment with Seal Beach—and each facility separately employed Yee —we cannot conclude Cambridge's placement of Yee (and her personnel file) at different facilities establishes an intent to extend Yee's agreement to arbitrate with *Seal Beach* to claims that Yee might have with a future Cambridge-affiliated employer. Simply put, although Cambridge and the facilities it services might be considered affiliated, there is no basis for us to read the Seal Beach arbitration agreement to apply to disputes concerning Yee's employment relationship with a Cambridge-affiliated facility not identified in the agreement.

We also need not resolve whether the trial court correctly found defendants failed to demonstrate Cambridge, and Sanner as its COO, qualified as "managers" of Seal Beach, enabling them to enforce the arbitration agreement as referenced parties. As we have discussed, Yee's complaint simply does not fall within

---

[12] The court ordered the employee's individual claims against that dealership to arbitration. (*Jarboe, supra*, 53 Cal.App.5th at pp. 543, 546.)

the express scope of the arbitration agreement. Thus, even if Cambridge and Sanner qualified as managers of Seal Beach, we could not read the agreement to include Yee's claims against them, as they are unrelated to her employment with Seal Beach.

Again, *Jarboe* is on point. As with the Seal Beach arbitration agreement, the arbitration provision in the employment contract at issue in *Jarboe* included claims against the named dealership's "owners, directors, officers, managers," etc. (*Jarboe, supra*, 53 Cal.App.5th at p. 549.) The court concluded the individual dealership owners' standing to compel the employee to arbitrate was "in the limited context of their ownership of [the dealership] named in the [e]mployment [a]greement." (*Id*. at p. 550.) Similarly, any standing Cambridge and Sanner might have under the Seal Beach arbitration agreement would be limited to their role as managers of Seal Beach. Seal Beach is not a named defendant, however, in contrast to the signatory dealership in *Jarboe*. And, Yee's claims do not implicate her employment relationship with Seal Beach at all, much less relate to Cambridge's actions in its capacity as a manager of Seal Beach. Accordingly, the agreement's reference to Seal Beach's "managers" does not enable Cambridge and Sanner to compel Yee to arbitrate *this* dispute.

**3.    *The doctrines of agency and equitable estoppel do not apply***

We also conclude defendants cannot enforce the Seal Beach arbitration agreement as nonsignatories based on agency or equitable estoppel principles. "[A]n agent may enforce an arbitration agreement to which its principal is a party." (*Ronay Family Limited Partnership v. Tweed* (2013) 216 Cal.App.4th 830, 838 (*Tweed*).) Thus, a nonsignatory defendant may "compel

18

a signatory plaintiff to arbitrate where there is a connection between the claims alleged against the nonsignatory and its agency relationship with a signatory." (*Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 863 (*Cohen*).) A nonsignatory defendant also " 'may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claim when the causes of action against the nonsignatory are "intimately founded in and intertwined" with the underlying contract obligations.' [Citation.] The doctrine applies where the claims are ' " 'based on the same facts and are inherently inseparable' " from the arbitrable claims against signatory defendants.' [Citation.]" (*Garcia v. Pexco, LLC* (2017) 11 Cal.App.5th 782, 786 (*Garcia*).)

Defendants argue *Garcia* is dispositive on both issues. We disagree. There, a temporary staffing company—Real Time —hired Garcia and assigned him to work for Pexco. (*Garcia, supra*, 11 Cal.App.5th at p. 784.) Garcia signed an arbitration agreement with Real Time, but not with Pexco. (*Ibid.*) Garcia sued both Real Time and Pexco (and another defendant) for wage and hour violations that occurred during his assignment with Pexco, alleging they jointly employed him and acted as each other's agent. (*Id.* at p. 785.) The appellate court concluded Pexco, as a nonsignatory to Real Time's arbitration agreement with Garcia, could compel Garcia to arbitrate his claims against it under the agency exception based on Garcia's agency allegations and that the complaint's causes of action alleged identical claims and conduct regarding the workplace violations against "[a]ll [d]efendants without any distinction." (*Id.* at p. 788.)

19

The court also found the doctrine of equitable estoppel enabled Pexco to compel arbitration. The court explained all of Garcia's claims were "intimately founded in and intertwined with his employment relationship with Real Time"—which was governed by the employment agreement requiring arbitration— and Garcia's claims against Pexco in turn were "rooted in his employment relationship with Real Time." (*Garcia*, *supra*, 11 Cal.App.5th at p. 787.) Critically, Garcia's claims against the nonsignatory Pexco were based on the very same facts alleged against Real Time. (*Id.* at p. 788.) Thus, it would have been inequitable for Garcia to hold Pexco liable for alleged wage and hour claims as a joint employer with Real Time, while at the same time argue his arbitration agreement with Real Time did not apply to Pexco. (*Ibid.*)

The facts here are decidedly different. True, Yee alleges "defendants" acted as agents of one another, and Cambridge and Broadway jointly employed her.[13] But, in contrast to *Garcia*, the signatory to the arbitration agreement here—Seal Beach— is not a named defendant. While Garcia alleged the signatory

_____

[13] Defendants argue that, in denying their motion to compel, the trial court did not consider Yee's allegations about defendants jointly employing her and acting as agents of one another. Nothing in the record indicates defendants objected to the trial court's statement of decision. We therefore presume the court considered these allegations and impliedly found they were insufficient to establish defendants' agency and equitable estoppel theories in light of the evidence—or lack thereof—that we discuss. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134 [trial court's order is presumed to be correct on appeal and appellate court will imply findings to support it where party did not object to statement of decision].)

20

and nonsignatory were his joint employers fulfilling the same role (*Garcia, supra*, 11 Cal.App.5th at p. 788), Yee does not allege *Seal Beach* jointly employed her with Cambridge and Broadway. In fact, the complaint does not mention Seal Beach at all.

Defendants note Yee alleges Cambridge's then-COO hired her "as an administrator-in-[t]raining for [d]efendants" on the date her employment with Seal Beach began. They argued below that by alleging Cambridge—rather than Seal Beach—hired Yee, Yee alleged an agency relationship existed between Cambridge and Seal Beach. It may very well be that Cambridge acted as Seal Beach's agent when it apparently hired Yee for Seal Beach. But, nothing in Yee's complaint or the record demonstrates Cambridge continued to act as Seal Beach's agent in relation to its employment of Yee *after* Yee left Seal Beach for her job with Ontario and then Broadway.

Nor do Yee's joint employment and agency allegations equitably estop her from avoiding arbitration with defendants. In *Jarboe*, although the employee's complaint alleged defendants were " 'joint employer[s],' " and alleged all but one cause of action against " '[a]ll [d]efendants,' " the court found those "boilerplate allegations" insufficient to support the nonsignatory defendants' equitable estoppel claim. (*Jarboe, supra,* 53 Cal.App.5th at p. 554.) The court noted defendants never admitted they jointly employed the employee, nor produced evidence, for example, showing the signatory dealership's hiring of the employee "meant that [the employee] concurrently worked for all other dealerships." (*Ibid*.) Instead, the record, as here, "suggest[ed] that each dealership maintained separate relationships with that dealership's employees." (*Ibid*.) For example, before the employee could work for the second dealership, he had to

21

be " 'moved' " from the original dealership, and after the move, his payroll records reflected the new dealership as his only employer.  (*Ibid*.)

The same is true here.  Yee was transferred from Seal Beach, and, once transferred, her payroll records reflected the new facility—first Ontario and then Broadway—as her employer. Defendants here also produced no evidence demonstrating Seal Beach concurrently employed Yee with any other facility or with Cambridge.  Indeed, both the Seal Beach and Broadway handbooks disclaim any employment relationship between the respective facility's employees and its "consulting resource companies or organizations," i.e., Cambridge.  And, Seal Beach identified itself as Yee's sole employer.

In any event, as we repeatedly have said, Yee's claims are not based on any conduct arising from or relating to any aspect of her employment relationship with Seal Beach.  Yee neither alleges defendants engaged in improper conduct on behalf of or to benefit Seal Beach nor seeks to hold any defendant liable for Seal Beach's employment actions, as Garcia did with Pexco. Based on the record, therefore, we cannot conclude Yee is attempting to avoid arbitration " ' "by suing nonsignatory defendants for claims that are ' "based on the same facts and are inherently inseparable" ' from arbitrable claims against signatory defendants." ' "  (*JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1238.)

As defendants failed to establish a connection between Yee's claims alleged against them and their purported agency relationship with Seal Beach, they cannot enforce the Seal Beach agreement as nonsignatory agents.  (*Cohen, supra*, 31 Cal.App.5th at p. 864 [connection between agency relationship

22

and claims is what "makes it equitable to allow . . . nonsignatory [defendants] to enforce" arbitration provision against signatory plaintiff].) Nor did defendants demonstrate Yee's claims to be " 'intimately founded in and intertwined' with" or "rooted in" her employment relationship with Seal Beach or "within the scope" of her agreement to arbitrate claims against Seal Beach. (*Garcia, supra*, 11 Cal.App.5th at p. 787; *Jarboe, supra*, 53 Cal.App.5th at p. 554.) Accordingly, "the inequities that the doctrine of equitable estoppel is designed to address are not present" here. (*Jarboe, supra*, 53 Cal.App.5th at p. 555.)

4. ***Defendants did not establish they are third party beneficiaries of the Seal Beach arbitration agreement***

Defendants also did not meet their burden to prove the Seal Beach arbitration agreement was intended to benefit them. (*Jarboe, supra*, 53 Cal.App.5th at p. 550.) "To invoke the third party beneficiary exception, [defendants] had to show that [the Seal Beach arbitration agreement] was 'made expressly for [their] benefit.' " (*Tweed, supra*, 216 Cal.App.4th at pp. 838–839 [third party need not be named, however, where " 'he shows that he is a member of a class of persons for whose benefit' " contract was made].)

As we discussed, there is no basis to conclude the Seal Beach arbitration agreement was intended to extend to Yee's employment at sister facilities, like Broadway, and it is expressly limited to claims relating to Yee's employment with Seal Beach. (See *Jarboe, supra*, 53 Cal.App.5th at pp. 551–552 [nonsignatory defendants failed to establish they were third party beneficiaries of arbitration agreement between a related, signatory defendant and plaintiff where there was no basis to conclude plaintiff intended his employment agreement, that contained the

23

arbitration provision, to apply to anyone other than the employer named in the agreement].)

In contrast, in *Tweed*, the nonsignatory defendants— agents and registered representatives of a securities broker— sought to enforce, as third party beneficiaries, the plaintiff's arbitration agreement with the securities broker. (*Tweed, supra*, 216 Cal.App.4th at pp. 835–836.) The agreement in *Tweed* specifically applied to disputes that arose out of or were related to the plaintiff's transactions with the securities broker or its agents or registered representatives, and plaintiff's dispute with defendants involved such transactions. (*Id.* at pp. 834–835.) Accordingly, the court concluded that, "[b]y expressly requiring arbitration of claims against [the securities broker's] agents and registered representatives, the arbitration clause was intended to benefit nonparties such as [defendants]." (*Id.* at p. 839.)

At best, therefore, assuming Cambridge and Sanner could be considered Seal Beach's "managers" under the terms of the arbitration agreement, they would be intended beneficiaries of that agreement as to claims asserted against them in that capacity alone. Yee does not allege Cambridge acted wrongfully in its capacity as a so-called manager at Seal Beach, however, and Sanner did not become Cambridge's COO until Yee already had left, or was about to leave, Seal Beach's employ. Accordingly, any third party beneficiary status they might have under the arbitration agreement would not enable them to compel Yee to arbitrate her claims, which are outside the express scope of the agreement.

24

**5.** ***There is no evidence defendants assumed***
     ***Seal Beach's obligations to Yee***

Finally, defendants contend that, because Cambridge transferred, and the facilities "accepted," Yee's personnel file—including the signed arbitration agreement—they established their intent "to assume the rights and obligations of the Arbitration Agreement." We cannot agree.

First, the record is devoid of any evidence that Seal Beach assigned its rights to defendants and defendants assumed Seal Beach's obligations under the employee handbook—the agreement containing the arbitration provision—or with respect to Seal Beach's employment relationship with Yee generally. Indeed, as Yee notes, any obligation Seal Beach owed to Yee under the handbook—or as Yee's employer—ended when Yee left Seal Beach's employment.

Second, the cases on which defendants rely, *Thomson-CSF, S.A. v. American Arbitration Ass'n* (2d Cir. 1995) 64 F.3d 773 and *Gvozdenovic v. United Air Lines, Inc.* (2d Cir. 1991) 933 F.2d 1100, are inapposite. In *Thomson-CSF*, the court explained a nonsignatory "may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate." (*Thomson-CSF*, at p. 777.) There, the nonsignatory *plaintiff*—whom the petitioners sought to bind to arbitration— did not "manifest an intention to be bound" by the agreement containing the arbitration provision. (*Ibid.*) In *Gvozdenovic*, the court implied *plaintiff* flight attendants agreed to arbitrate, despite their not having been parties to the arbitration agreement at issue, because they voluntarily participated in the arbitration by sending a representative to appear on their

behalf at the proceedings and never objected to or refused to participate in the arbitration process. (*Gvozdenovic,* at p. 1105.)

Defendants essentially argue that, because *they* intended to be bound by the Seal Beach arbitration agreement, Yee must arbitrate her claims against them. But in *Thomson-CSF* and *Gvozdenovic*, the defendants sought to compel nonsignatory plaintiffs to arbitrate their claims based on the plaintiffs' actions, not the other way around. Thus, in those cases, it was the party being compelled to arbitrate who had to have indicated an intent to be bound by the arbitration agreement.

Defendants present no authority where a nonsignatory defendant could enforce an arbitration agreement against a plaintiff simply based on the defendant's own intent to be bound by it, without regard to whether the signatory plaintiff intended to extend her own arbitration obligation to claims against the nonsignatory. As we have discussed, the transfer of Yee's personnel file and signed arbitration agreement with Seal Beach to Broadway through Cambridge establishes no such intent. The court did not err in rejecting defendants' assumption theory.

Because we conclude defendants cannot compel Yee to arbitrate her claims against them under the Seal Beach arbitration agreement, we need not consider Yee's unconscionability or waiver arguments.

## DISPOSITION

The order denying defendants' petition to compel arbitration is affirmed. Chia Li Yee is to recover her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


KIM, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27